**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re: | * |
| | |
| HEDWIN CORPORATION | *   Case No. 14-15194 |
| | |
|     Debtor | *   Chapter 11 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**AFFIDAVIT OF CHARLES S. DEUTCHMAN IN SUPPORT OF FIRST-DAY MOTIONS**</u>

       I, Charles S. Deutchman, being duly sworn, deposes and states, under penalty of perjury, that the following information is true to the best of my knowledge, information and belief.

<b>Background</b>

    1.  I am the Managing Director at Shared Management Resources, Ltd. ("SMR"), with an office located at 28026 Gates Mills Boulevard, Pepper Pike, Ohio 44124. SMR has provided turnaround management services to the Debtor since October 1, 2013. As a result of providing these services, I am familiar with the day-to-day operations, financial condition, books and records, and business affairs of the Debtor. I submit this Affidavit in support of the Debtor's Chapter 11 petition, first-day applications, and motions listed on <u>Exhibit A</u> hereto (the "First-Day Motions").

    2.  Except as otherwise indicated, all facts set forth in this Affidavit are offered to the best of my knowledge, information and belief and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtor's industry, operations and financial condition. If I were

1

called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Affidavit on behalf of the Debtor.

3.    To minimize any adverse effects on the Debtor's business as a result of the commencement of the Chapter 11 case, the Debtor has requested various types of relief in the First-Day Motions.  The First-Day Motions seek relief, among other things, to:  (a) approve, on an interim basis, a debtor-in possession credit facility with Bank of America, N.A. (the "DIP Lender"), which is necessary in order to allow the Debtor to continue to operate while in Chapter 11; (b) permit the continuation of the Debtor's cash management system and other business operations without interruption; (c) permit the Debtor to pay pre-petition accrued wages and payroll taxes; (d) permit the Debtor to pay certain pre-petition employee benefits related to a self-insured health care plan; and (e) permit the Debtor to employ SMR as Chief Restructuring Officer and approve its compensation arrangement.  Maintaining the support of the Debtor's employees as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption, will be critical to the Debtor's reorganization efforts and its ability to maximize the recovery prospects for all interested parties. The relief requested in the First-Day Motions is in the best interest of the Debtor, its creditors, and is necessary to avoid immediate and irreparable harm.

**Overview of the Debtor's Business**

4.    Hedwin Corporation ("Hedwin" or the "Debtor") is a Maryland corporation and since 2004 has been wholly owned by current and former employees of the company pursuant to an Employee Stock Option Plan (the "ESOP").    The company was founded in 1946 as a manufacturer of molten thermoformed sheet for use in plastic heat-sealing.  In 1956, Hedwin

2

patented its Cubitainer® design.  In subsequent years, the company's product lines grew to include blow molding and injection molding technologies.

5.   The Debtor is a leading manufacturer of customized industrial plastic packaging, which it sells to wholesalers and distributors throughout the United States, Canada and Europe. The company's products include high performance and regulated specialty industrial packaging for use in the chemical, medical and institutional food industries.  The principal product lines consist of: (i) the Cubitainer® Package with accompanying Cube® Insert, which is a high performance alternative to rigid wall open pails with lids; (ii) blow-molded high density polyethylene containers, which include branded and custom extruded and lightweight containers, bottles and pails; and (iii) branded liners designed to protect materials processed in pails and drums.

6.   As of the Petition Date, the Debtor employed approximately 300 employees, of which approximately 50 are salaried and approximately 250 are hourly.  None of the Debtor's employees are represented by a labor union.  Hourly, salaried and contract labor comprise nearly 25% of the Debtor's production costs.

7.   The Debtor's manufacturing facility is located at 1600 Roland Heights Avenue, Baltimore, Maryland.  The Debtor has a warehouse facility at 1700 West 41st Street, Baltimore, Maryland and a warehouse and assembly facility at 9175 Moya Blvd. (Unit D), Reno, Nevada. All of the Debtor's facilities are leased.

8.   In 2012, the Debtor recorded net sales of $44 million with a gross profit of $4.5 million.  In 2013, the Debtor generated net sales of $43.5 million and had a gross profit of $3.4 million.   The decline in profitability in 2013 was primarily attributable to the business interruption which resulted from a major fire in June 2013 to the Debtor's manufacturing facility.

3

The fire negatively affected the Debtor's operations, causing both temporary and permanent shutdown to certain assembly lines.  As of the fiscal year ending December 31, 2013, the Debtor had total net assets of approximately $15 million.

**Pre-Petition Secured Lending Relationships**

9.   Bank of America, N.A., successor to LaSalle Business Credit, LLC ("Bank of America")  was the secured lender to Hedwin prior to and since the 2004 acquisition of Hedwin by the ESOP.  Prior to the commencement of this bankruptcy proceeding, Bank of America made loans, advances and provided other financial accommodations to the Debtor pursuant to the terms and conditions as initially reflected in that certain First Amended and Restated Loan and Security Agreement dated as of January 19, 2010 by and between the Debtor, and Bank of America, as amended and modified through the execution of ten (10) subsequent agreements (collectively, the "Loan Agreement").

10. As of March 28, 2014, the Debtor was indebted to Bank of America under the pre-petition Loan Agreement as follows: (A) under a revolving line of credit (the "Revolving Loans")**,** principal in the approximate amount of $4,982,120.50; and  (B) under a term loan (the "Term Loan"), principal in the approximate amount of $600,000.00, plus additional unpaid fees and expenses due and owing to Bank of America.

11. As part of the 2004 acquisition funding, a private equity firm by the name of South Franklin Street Partners ("SFSP") through one of its funding vehicles ACP-1, L.P. advanced $3,000,000 to Hedwin.  SFSP's loan facility has always been subordinated to the Bank of America.  As of March 16, 2014, the principal balance owed to South Franklin Street Partners is in the approximate amount of $3,226,036.

12. Hedwin has capital lease obligations, as of February 28, 2014 in the approximate

amount of $20,159.

## Events Leading to Bankruptcy

13. A combination of factors and events has negatively impacted and continue to adversely affect the Debtor's business operations and its financial condition.  The Debtor's current weakened and worsening financial condition stems from, among other things: (i) expenses incurred and losses sustained due to the June 2013 fire; (ii) fluctuating and higher resin prices; (iii) margin compression; (iv) delayed capital investment in equipment and production processes, resulting in increased production costs and inefficiencies; and (v) quality control problems. As a result, the Debtor is suffering a liquidity crisis and continues to suffer major cash flow problems.

14. In October, 2013, due to the Debtor's deteriorating financial condition, the Debtor hired Charles S. Deutchman ("Deutchman") to provide turnaround management services. Deutchman has conducted extensive due diligence into the Debtor's financial condition, has explored various strategies with management for improving the company's performance, and has assisted and continues to assist management in restructuring the current operations of the business.

15. In December 2013, the Debtor retained Mesirow Financial, Inc. ("Mesirow") as its investment banker to assist the Debtor in identifying strategic alternatives and to assist the Debtor in connection with any possible sale transaction.

16. The Debtor, in consultation with its advisors, determined that the filing of a Chapter 11 bankruptcy case was necessary and appropriate and that a sale of substantially all of the Debtor's assets was the best option presently available to maximize value and preserve employee

5

jobs. Absent a sale, the Debtor would have to immediately terminate its employees and begin the wholesale liquidation of its assets to the detriment of its estate and creditors.

<b>The Need for Financing</b>

17. As reflected in the Debtor's cash flow forecast for the first 30 days of this case (a copy of which is attached as <u>Exhibit B</u>, the Debtor requires authority to borrow under the Dip Facility (as defined below), in accordance with the lending formula, sublimits and terms and conditions set forth in the DIP Financing Documents (as defined in the proposed Interim Financing Order) up to an additional **$500,000** in order to fund ongoing operations and to administer and preserve the value of the estate. Without this immediate post-petition financing, the Debtor does not have sufficient available sources of working capital, including cash collateral, to operate in the ordinary course of its business, and would be unable to pay its payroll and other operating expenses and would be prevented from preserving and maintaining the going concern value of its business. The ability of the Debtor to maximize a return for all creditors requires the availability of working capital pursuant to the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, its creditors and equity holders and the possibility for a successful reorganization or sale of the Debtor's assets as a going concern or otherwise.

<b>First-Day Motions</b>

18. Concurrently with the filing of this Chapter 11 case, the Debtor has filed a number of First-Day Motions. The Debtor anticipates that the Court will conduct a hearing shortly after the commencement of this case (the "First-Day Hearing"), at which the Court will hear the First-Day Motions.

19. An important and critical element of the success of this Chapter 11 case will be the

6

entry of orders granting the relief requested in each of the First-Day Motions.  Generally, the First-Day Motions are designed to facilitate:  (a) to approve on an interim basis the post-petition financing agreements negotiated between the Debtor and Bank of America, as the DIP Lender; (b) the continuation of the Debtor's existing cash management systems and other business operations without interruption, (c) to permit the Debtor to pay pre-petition accrued wages and payroll taxes; (d) to permit the Debtor to pay certain pre-petition employee benefits related to a self-insured health care plan; and (e) to permit the Debtor to employ SMR as Chief Restructuring Officer and approve the compensation arrangement. The factual background in support of each First-Day Motion is provided below:

### Debtor's Emergency Motion for Order Under §364(d)(1) Authorizing the Debtor to incur Post-Petition Secured Indebtedness

20. The Debtor has filed an Emergency Motion (the "DIP Financing Motion") seeking the entry of an interim order (the "Interim DIP Financing Order") and final order (the "Final DIP Financing Order" and together with the Interim DIP Financing Order, the "Financing Order") authorizing the Debtor to incur post-petition secured  indebtedness with priority over all other secured indebtedness and with administrative superpriority, granting liens, authorizing use of cash collateral and providing for adequate protection.  Bank of America, as the DIP Lender, has agreed to make available to the Debtor a debtor in possession financing facility (the "DIP Facility") pursuant to which the Debtor may obtain loans from time to time under the terms set forth in the Financing Order and the DIP Financing Documents, including the Agreement for Post-Petition Financing that is attached to the DIP Financing Motion.  The DIP Facility consists of the post-petition continuation and gradual "roll up" of the Debtor's pre-petition Revolving Loans.  The primary terms of the DIP Facility are as follows:  (a) inclusive of the principal

7

balance of the pre-petition Revolving Loans outstanding on the Petition Date, the DIP Lender is prepared to loan up to $6.5 Million; (b) interest will accrue on the Revolving Loans at prime plus 3% and on the Term Loan at prime plus 3.5%, and interest on the loans will continue to be due and payable on the first day of each month; (c) the DIP Lender is charging a closing fee in the amount of $106,600 which will be paid upon the earlier of the closing on a sale of substantially all of Hedwin's assets or the termination date of the DIP Facility; (d) proceeds of the DIP Facility shall be used, in a manner consistent with the terms and conditions of the DIP Financing Documents, and in accordance with the Budget (as defined in the DIP Financing Documents) as follows: (i) solely for payment of post-petition obligations for working capital and general corporate purposes and payment of the carve out and costs of administration of the bankruptcy case, to the extent set forth in the Budget; (ii) to make adequate protection and other payments to Bank of America on the pre-petition obligations for use of cash collateral; and (iii) to pay any of the credit extensions or other post-petition obligations of other expenses that are required or authorized to be paid under the DIP Financing Documents.

21. I believe that the circumstances require the Debtor to obtain debtor in possession financing to pay for operating expenses, including to fund payroll.  Absent approval of the DIP Financing Motion, the Debtor would be unable to pay necessary and ordinary expenses during the period prior to the entry of the Final DIP Financing Order.

22. The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit, allowable only under sections 364(c)(2), 364(c)(3), and 365(d) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Financing Documents and the proposed Financing Order (as defined below).  Financing on a

8

post-petition basis is not otherwise available without providing the DIP Lender the protections set forth in the proposed Financing Order.

**Emergency Motion Seeking Order**
**Approving Continued Use of Cash Management System**

23. The Debtor has filed an Emergency Motion Seeking an Order Approving Continued Use of its Cash Management System (the "Cash Management Motion"). Prior to the Petition Date, the Debtor maintained the following bank accounts (the "Accounts") at Bank of America for the following purposes: (a) a disbursement account used solely to fund payroll obligations owed to its employees for wages and other benefits incurred (the "Payroll Account"); (b) a receipts account designated to process receivables from account debtors (the "Lockbox Account"); and (c) a disbursements account designed to process all other business operations and transactions (the "Operations Account").

24. Through the Cash Management Motion, the Debtor wishes to maintain and continue using the Accounts in order to maximize cash flow to the business, and minimize the administrative burden and expense of creating new bank accounts.

25. If the Debtor is required to close the Accounts, it would be inefficient, costly and disruptive to the Debtor's businesses. Closing the Payroll Account would cause a significant delay in the Debtor's ability to fund its payroll obligations. With respect to the Lockbox Account, an interruption or delay in the payment of receivables owed to the Debtor that is likely to result if the account is closed would also jeopardize the Debtor's business operations and ability to fund ongoing business expenses. This is also true with respect to the Operations Account, from which the Debtor pays all business expenses other than payroll.

26. I believe that it is imperative that the Cash Management Motion be granted so that the Debtor is permitted to maintain its existing accounts at Bank of America

#2159537v.1

**Emergency Motion to Pay Pre-Petition Accrued Wages and Payroll Taxes**

27. The Debtor has filed an Emergency Motion to Pay Pre-Petition Wages and Payroll Taxes (the "Wage Motion"). The Debtor currently employs approximate 300 employees.  In the ordinary course of business, the Debtor's regular payroll is processed and paid differently depending on whether employees are considered exempt (the "Exempt Employees") or non-exempt from the overtime provisions of the Fair Labor Standards Act.  With respect to non-exempt employees, payroll is further divided into salaried employees ("Non-Exempt Salaried Employees") and hourly ("Non-Exempt Hourly Employees").

28. For Exempt Employees, payroll is processed on the 14th and 28th day of each calendar month, and covers the approximate two-week period ending the first or second half of the calendar month, depending on the payroll date.  For example, the payroll paid on Friday, March 14, 2014 for Exempt Employees covered the two-week period of Saturday, March 1, 2014 through Saturday, March 15, 2014. The total gross cost of the March 14 Exempt Payroll was approximately $105,000, and the net amount after any deductions (including salary, taxes and non-health/medical benefits, and reflecting any employee garnishments or deductions) was approximately $68,800.  Future payrolls for Exempt Employees will be in similar, but not necessarily identical amounts.

29. For Non-Exempt Salaried Employees, payroll is processed weekly on each Friday, covering the prior week from the Monday immediately prior to the pay date through the Sunday immediately subsequent to the pay date, along with any overtime accrued during the week that was two weeks prior to the payroll date.  For example, the payroll paid on Friday, March 14, 2014 covered all regular wages earned during the week-long period of Monday, March 10, 2014 through Sunday, March 16, 2014, along with all overtime accrued during the week-long period

10

of Monday, March 3, 2014 through Sunday, March 9, 2014. The total gross cost of the March 14 Non- Exempt Salaried Payroll was approximately $29,300, and the net amount after any deductions (including salary, taxes and non-health/medical benefits, and reflecting any employee garnishments or deductions) was approximately $19,000. Future payrolls for Non-Exempt Salaried Employees will be in similar, but not necessarily identical amounts.  Subsequent payrolls were paid on Friday, March 21, 2014 and Friday, March 28, 2014.  The next payroll for non-exempt salaried employees is payable in the ordinary course of business on Friday, April 4, 2104, covering all regular wages earned during the week-long period of Monday, March 31, 2014 through Sunday, April 6, 2014, along with all overtime accrued during the week-long period of March 24, 2014 through Sunday, March 30, 2014.

30. For Non-Exempt Hourly Employees, payroll is processed weekly on each Friday, covering the week starting on the Monday that fell two-weeks prior to the pay date through the Sunday immediately prior to the pay date, along with any overtime accrued during that period. For example, the payroll paid on Friday, March 14, 2014 covered all regular wages earned during the week-long period of Monday, March 3, 2014 through Sunday, March 9, 2014, along with all overtime accrued during the same period. The total gross cost of the March 14 Non-Exempt Hourly Payroll was approximately $165,500, and the net amount after any deductions (including salary, taxes and non-health/medical benefits, and reflecting any employee garnishments or deductions) was approximately $117,000. Future payrolls for Non-Exempt Hourly Employees will be in similar, but not necessarily identical amounts.  The next payroll for Non-Exempt Hourly Employees that is payable in the ordinary course of business is that which will occur on Friday, April 4, 2014, covering all regular wages earned during the week-long

period of Monday, March 24, 2014 through Sunday, March 30, 2014, along with all overtime accrued during that period (the "April 4 Non-Exempt Hourly Payroll").

31. Through the Wage Motion, the Debtor requests that the Court authorize the payment of prior payrolls for exempt employees, non-exempt salaried employees and non-exempt hourly employees, to the extent that any transactions have not cleared banking channels, and to the extent they include pre-petition wages, including all Benefits and all associated payroll taxes (collectively, the "Pre-Petition Payroll"). The Debtor also requests that the Court authorize the payment of the next payroll for exempt employees, non-exempt salaried employees and non-exempt hourly employees, to the extent that it covers the period prior to the Petition Date. No employee will be paid wages in excess of the priority cap set forth in 507(a)(4) of the Bankruptcy Code.

32. It is my belief that payment of these pre-petition priority claims is in the best interests of the Debtor's estate to avoid disruption of its operations. In addition, the Debtor's employees are essential to the continued management and operation of its business. If the Debtor fails to pay the Pre-Petition Payroll, the Debtor's employees would suffer economic hardship, employee morale would suffer, key employees may leave, and the Debtor's ability to provide services would be severely jeopardized.

### Emergency Motion for Authority to Pay Certain Pre-Petition Employee Benefits Related to Self-Insured Health Care Plan

33. The Debtor has filed an Emergency Motion for Authority to Pay Certain Pre-petition employee Benefits Related to its Self-Insured Health Care Plan (the "Health Care Plan Motion"). The Debtor currently employs approximately 300 employees. The Debtor maintains and funds a self-insured health care plan for its employees (the "Health Care Benefits"). The Health Care Benefits are administered through a third party named CFA, LCC d/b/a NCAS

("NCAS") which is affiliated with the Blue Cross Blue Shield association. Pursuant to an Administrative Services Agreement, medical providers submit health care claims to NCAS relating to the Health Care Benefits provided to Debtor employees, including medical, dental and prescription services and costs. NCAS reviews and adjudicates the claims before submitting invoices to the Debtor for reimbursement on a weekly basis. Typically, the Debtor remits payment within several days of the issuance of a weekly invoice. The average amount of claims funded for each weekly invoice is approximately $38,000.

34. NCAS processes for payment virtually all claims once received by the medical service provider within 90 days for payment. Because certain pre-petition claims for Health Care Benefits may not have been submitted by NCAS to the Debtor for payment prior to the Petition Date, the Debtor seeks authority from the Court to pay any Health Care Benefits that were incurred within 180 days prior to the Petition Date which would constitute priority claims under §507(a)(4) of the Bankruptcy Code. The Debtor does not propose to pay Health Care Benefit claims that would exceed, for any individual employee, the priority cap set forth in §507(a)(4).

35. I believe that it is imperative for both employee morale and maintaining the Debtor's workforce that the Health Care Plan Motion be granted. If the Debtor failed to pay the claims described in the Health Care Plan Motion, the employees would suffer economic hardship by absorbing these expenses outside of the health plan, and employee morale would suffer and key employees might leave.

.

## Application to Retain Shared Management Resources, Ltd.
## As Chief Restructuring Officer and Approval of Compensation Arrangement

36. The final First-Day Motion is an Application to Retain Shared Management

13

Resources, Ltd. as Chief Restructuring Officer and Approval of Compensation Arrangement (the "SMR Retention Application"). On February 24, 2014, the Debtor entered into a letter agreement with SMR, dated February 1, 2014 (the "Agreement") for certain operational consulting services to be provided by SMR. Pursuant to the Agreement, SMR, through its Managing Director Charles Deutchman ("Deutchman") will serve as the Chief Restructuring Officer of the Debtor.

37. Under the Agreement, SMR has agreed to provide certain consulting and restructuring services to the Debtor, and upon approval of the Court, SMR will continue to provide the following services to the Debtor: (a) evaluate the Debtor's cash position and utilization of collateral base with the Bank of America; (b) review the reasonableness of weekly thirteen week cash forecasts prior to submission to Bank of America; (c) manage the sales and marketing of the business by Mesirow Financial, Inc. ("Mesirow"), including participation in all substantive discussions and meetings with prospective buyers, and providing updates on the sales process to both Debtor's management and Board of Directors; (d) manage the Debtor's relationship with Bank of America, including but not limited to weekly conference calls between the Debtor and Bank of America; (e) assist Debtor's outside bankruptcy counsel; (f) enhance the Debtor's "Dashboard" reporting mechanism to assist management in effectively monitoring the Debtor's critical operations; (g) manage the resolution of certain insurance claims with the Debtor's insurers; (h) prepare written reports as requested by the Debtor's board of directors; and (i) provide all additional services related to the engagement as Chief Restructuring Officer of the Debtor.

38. Regarding the compensation to be paid to SMR, SMR will be compensated at a flat rate of $1,900 per day, and will be reimbursed for all reasonable and necessary out-of-pocket

#2159537v.1

expenses including but not limited to, costs of travel, lodging, reproduction, computer usage, postage, mileage and other direct expenses; provided, however, that such compensation and reimbursements paid to SMR shall not exceed the amounts allocated in the Budget set forth in the Financing Order, and shall be paid in accordance with the terms of the Financing Order.

39. Approval of the SMR Retention Application is crucial to the Debtor's reorganization efforts since it does not have an internal option with significant restructuring experience. The experience and expertise of SMR is necessary to allow the Debtor to successfully navigate its restructuring, continued operations and potential sale of the Debtor's assets or certain product lines.  SMR's services are reasonably necessary for the Debtor to effectively manage its current restructuring. Secondly, SMR is familiar with the Debtor's operations, having served as a Management Consultant to the company since October 1, 2013.  Accordingly, the employment of SMR will benefit the Debtor's bankruptcy estate and should be approved.

### Consent of Bank of America

40. The Debtor's senior secured lender, Bank of America, has consented to the relief requested in each of the First-Day Motions.

### Conclusion

41. Approval of the First-Day Motions filed by the Debtor is a critical step for the Debtor to attempt to reorganize its business, as such approval will (a) enable the Debtor to obtain the financing so that it can continue to operate its business in Chapter 11; (b) maintain employee morale by ensuring that employees receive priority pre-petition wages and benefits; (c) avoid upheaval by allow the Debtor to maintain its existing cash management system; and (d) ensure that management during the Chapter 11 is seamless by employing SMR as Chief Restructuring Officer.

#2159537v.1

Dated:   April 2, 2014

/s/ Charles S. Deutchman
Charles S. Deutchman

#2159537v.1