IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| **HEDWIN CORPORATION** | * | **Case No. 14-15194** |
| Debtor. | * | **Chapter 11** |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**EMERGENCY DEBTOR'S MOTION FOR AN ORDER: (A) APPROVING BIDDING
PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS;
(B) AUTHORIZING AND SCHEDULING AN AUCTION; (C) SCHEDULING HEARING
FOR APPROVAL OF THE SALE OF ASSETS FREE AND CLEAR OF LIENS AND
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO THE SUCCESSFUL BIDDER; (D) APPROVING
BREAKUP FEE AND EXPENSE REIMBURSEMENT; (E) APPROVING
PROCEDURES AND SETTING DEADLINES FOR THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
INCLUDING CURE AMOUNTS RELATING THERETO; (F) APPROVING CERTAIN
DEADLINES AND THE FORM, MANNER AND SUFFICIENCY OF NOTICE; AND (G)
<u>GRANTING OTHER RELATED RELIEF</u>**

       Hedwin Corporation, the debtor and debtor in possession (the "<u>Debtor</u>"), by

counsel, moves, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002,

6004 and 6006 of the Federal Rules of Bankruptcy Procedure, for the entry of an Order, the

proposed form of which is attached as **Exhibit 1** (the "<u>Bidding Procedures Order</u>"): (a)

approving bidding procedures for the sale of substantially all of the Debtor's assets; (b) setting a

date for and authorizing an auction (the "<u>Auction</u>") to sell substantially all of the Debtor's assets;

(c) scheduling a hearing (the "<u>Sale Hearing</u>") for approval of a sale of the Debtor's assets free

and clear of liens, claims, encumbrances and other interests, and the assumption and assignment

of certain executory contracts and unexpired leases; (d) authorizing payment of a breakup fee

and expense reimbursement; (e) approving procedures and setting deadlines for the assumption

and assignment of executory contracts and unexpired leases, including cure amounts relating

1

thereto; and (f) approving certain deadlines and the form, manner and sufficiency notice of the foregoing; and (g) granting other related relief (the "Motion"). In support, the Debtor represents as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and other predicates for the relief sought herein include sections 105, 363, 365, 503, 1107 and 1108 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Rules").

**The Commencement of the Bankruptcy Case**

4.      On April 2, 2014 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

5.      The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      As of the date of this Motion, no official committee of unsecured creditors (the "Committee") has been appointed by the Office of the United States Trustee for the District of Maryland (the "U.S. Trustee") pursuant to § 1102(a)(1) of the Bankruptcy Code.

2

#2166417v.3

## **Company Background**

7.     The Debtor is a Maryland corporation and since 2004 has been wholly owned by current and former employees of the company pursuant to an Employee Stock Option Plan (the "ESOP").

8.     The company was founded in 1946 as a manufacturer of molten sheet thermoforms for use in plastic heat-sealing.  In 1956, Hedwin patented its Cuitainer® design.  In subsequent years, the company's product lines grew to include blow molding and injection molding technologies.

9.     The Debtor is a leading manufacturer of customized industrial plastic packaging, which it sells to wholesalers and distributors throughout the United States, Canada and Europe.   The company's products include high performance and regulated specialty industrial packaging for use in the chemical, medical and institutional food industries.  The principal product lines consist of: (i) the Cubitainer® Package with accompanying Cube® Insert, which is a high performance alternative to open pail heads; (ii) blow-molded high density polyethylene containers, which include branded and custom extruded and lightweight containers, bottles and pails; and (iii) branded liners designed to protect materials processed in pails and drums.

10.     As of the Petition Date, the Debtor employed approximately 300 employees, of which approximately 50 are salaried and approximately 250 are hourly.  None of the Debtor's employees are represented by a labor union.

11.     The Debtor's manufacturing facility is located at 1600 Roland Heights Avenue, Baltimore, Maryland.  The Debtor has a warehouse facility at 1700 West 41st Street,

3

Baltimore, Maryland and a warehouse and assembly facility at 9175 Moya Blvd. (Unit D), Reno, Nevada. All of the Debtor's facilities are leased.

12.     In 2012, the Debtor recorded net sales of $44 million with a gross profit of $4.5 million. In 2013, the Debtor generated net sales of $43.5 million and had a gross profit of $3.4 million. The decline in profitability in 2013 was primarily attributable to the business interruption resulting from a major fire in June 2013 to the Debtor's manufacturing facility. The fire negatively affected the Debtor's operations, causing a shutdown in certain assembly lines.

13.     As of the fiscal year end December 31, 2013, the Debtor had total net assets of approximately $15 million.

14.     A combination of factors and events has negatively impacted and continue to adversely affect the Debtor's business operations and its financial condition. The Debtor's current weakened and worsening financial condition stems from, among other things: (i) expenses incurred and losses sustained due to the June 2013 fire; (ii) fluctuating and higher resin prices; (iii) margin compression; and (iv) delayed capital investment in equipment and production processes, resulting in increased production costs and inefficiencies. As a result, the Debtor is suffering a liquidity crisis and continues to suffer major cash flow problems.

15.     In October, 2013, due to the Debtor's deteriorating financial condition, the Debtor hired Shared Management Resources, Ltd. ("SMR"), by and through its managing director Charles S. Deutchman, as Chief Restructuring Officer (the "CRO"). The CRO has conducted extensive due diligence into the Debtor's financial condition, has explored various strategies with management for improving the company's performance, and has assisted and continues to assist management in restructuring the current operations of the business.

4

16.     In December 2013, the Debtor retained Mesirow Financial, Inc. ("Mesirow") as its investment banker to assist the Debtor in identifying strategic alternatives and to assist the Debtor in connection with any possible sale transaction.

17.     The Debtor, in consultation with its advisors, determined the filing of a Chapter 11 bankruptcy case was necessary and appropriate and that a sale of substantially all of the Debtor's assets was the best option presently available to maximize value and preserve employee jobs.  Absent a sale, the Debtor would have to immediately terminate its employees and begin the wholesale liquidation of its assets to the detriment of the estate and its creditors.

**The Initial Sale Process**

18.     For several months preceding the Petition Date, the Debtor, together with its CRO and Mesirow, worked cooperatively to analyze and evaluate the business, operations and financial condition of the Debtor.  As part of this process, Mesirow assisted in: (i) preparing and negotiating confidentiality agreements for prospective purchasers; (ii) preparing an offering memorandum containing detailed information about the Debtor's business, operations and financial condition; (iii) identifying and contacting potential purchasers; (iv) establishing a data room for due diligence to be conducted by prospective purchasers; (v) evaluating proposals from prospective purchasers; and (vi) negotiating a stalking horse offer.

19.     As part of its marketing efforts, Mesirow contacted 78 parties to elicit interest in acquiring all or part of the business.  Interested parties were given operational, organizational and financial information on the Debtor and all were offered the opportunity to conduct on site due diligence.  Only 10 parties conducted on site due diligence and used the virtual data room.

20.    Mesirow, after consultation with the Debtor, set a deadline of March 12, 2014 for the submission of offers and gave notice of the deadline to those parties that had expressed an interest in making an offer.

**The Stalking Horse Offer**

21.    The Debtor has received offers to purchase substantially all of the assets of the Debtor from (i) Fujimori Kogyo Co., Ltd. ("Fujimori"); (ii) Peak Rock Capital; (iii) Blackstreet Capital Management, LLC; and (iv) Platinum Equity Advisors, LLC.

22.    After consultation with its advisors, the Debtor determined that the offer of Fujimori is presently the highest and best offer submitted (the "Stalking Horse Offer"). Accordingly, the Debtor and Fujimori (the "Stalking Horse Bidder") entered into an Asset Purchase Agreement ("Stalking Horse APA"), attached hereto as **Exhibit 2**, which is subject to higher and better offers and conditioned upon approval of the Bankruptcy Court.[1]

23.    The sale terms proposed by the Stalking Horse Bidder are set forth with particularity in the Stalking Horse APA.  Under the Stalking Horse APA, other than specifically "Excluded Assets" the Debtor will sell (and the Stalking Horse Bidder will buy) all of the Debtor's right, title and interest in, to and under all assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), whether presently existing or hereafter acquired, owned, leased, licensed or used or held for use in or related to the operation of the Debtor's business (the "Assets").[2]  The Assets include, among

---

[1]    The party closing under the Stalking Horse APA will be either Fujimori or its designee, which will be wholly-owned (directly or indirectly) by Fujimori.

[2]    As used herein, the term Assets has the same meaning as "Purchased Assets" in the Stalking Horse APA.  In the event of a conflict between the summary descriptions of the Stalking Horse APA contained herein and the Stalking Horse APA, the latter shall control.

6

other things, all of the Debtor's accounts receivable, certain contracts, equipment, intellectual property, inventory, leases, and other tangible personal property.

24.   Under the Stalking Horse APA, certain "Excluded Assets" are not being sold to the Stalking Horse Bidder.  These "Excluded Assets" include, without limitation, all Debtor's cash and cash equivalents, all avoidance claims arising under Chapter 5 of the Bankruptcy Code (with the exception of certain claims, such as those against creditors whose debts are being assumed), all of Debtor's bank accounts, certain insurance claims and right to proceeds therefrom, all of Debtor's corporate and organizational documents, and all contracts not assumed.

25.   The purchase price for the Assets under the Stalking Horse APA is $16,500,000 plus the assumption of certain liabilities.

26.   The Stalking Horse APA also provides, among other things, as follows:

(a)   The Assets will be sold free and clear of liens, claims, encumbrances and other interests.

(b)   The Court shall approve payment to the Stalking Horse Bidder (as a general, not super-priority, administrative claim) of a break-up fee in an amount equal to $600,000 (the "Break-Up Fee") and an expense reimbursement in an amount not to exceed $250,000 (the "Expense Reimbursement") for the Stalking Horse Bidder's reasonable and documented out-of-pocket expenses incurred in connection with the transaction contemplated hereby.  The Break-Up Fee and the Expense Reimbursement shall be paid to the Stalking Horse Bidder from the proceeds (the "Alternative Transaction Proceeds") of sale on the closing of an Alternative Transaction (defined in the Stalking Horse APA) approved by the Bankruptcy Court. Such payments shall be made to the Stalking Horse Bidder (i) on the closing date of the

7

Alternative Transaction, and (ii) prior to any other distributions to creditors (or otherwise) from the Alternative Transaction Proceeds. Other than the Bidding Procedures Order, no further or additional order from the Bankruptcy Court shall be required in order to give effect to the provisions relating to the terms of payment of the Break-Up Fee and Expense Reimbursement.

(c)     The Stalking Horse Bidder will assume certain liabilities including all trade accounts payable remaining unpaid as of the closing and that were either reflected on the Debtor's net asset calculation statement for the period ending December 31, 2013 or which thereafter arise in the ordinary course of business.

(d)     Certain executory contracts and unexpired leases will be assumed by the Debtor and assigned to the Stalking Horse Bidder, with the payment of all cure costs being advanced by the Stalking Horse Bidder in accordance with the terms of the Stalking Horse APA.

(e)     Except as expressly stated in the Stalking Horse APA, the Debtor is making no representation or warranties whatsoever, express or implied, with respect to any matter relating to the Assets. The Assets are being sold "AS IS," "WHERE IS," and "WITH ALL FAULTS."

(f)     The Staking Horse APA provides for the retention of all employees of the Debtor actively at work on the closing date.

### Approval of Bidding Procedures

27.     The Debtor submits that the Bidding Procedures, attached as **Exhibit 3,** are fair and reasonable and should be approved. The Bidding Procedures are designed to provide an organized process for the receipt and review of bids from potential purchasers with an ability to close on the sale of the Assets and to maximize value to the Debtor's estate. The requirement

8

for a deposit and evidence of financial wherewithal is designed to confirm that Auction participants are *bona fide* bidders with the ability and desire to consummate any proposed transaction.

28.     The Bidding Procedures are also designed to ensure that the Auction is conducted in a timely, fair and orderly manner.  The Debtor is requesting that the Auction be scheduled at the law offices of Tydings & Rosenberg LLP, 100 E. Pratt Street, 26th Floor, Baltimore, Maryland 21202 on a date no later than thirty-four (34) days of the filing of this Motion.  The Debtor believes the requested timing strikes the appropriate balance between affording potential bidders a sufficient opportunity to bid on the one hand, and tailoring the process to the needs of the Debtor on the other.

29.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

30.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest

9

and best return for a debtor's estate. The Debtor submits that the adoption of the Bidding Procedures will afford the Debtor the opportunity to subject the Assets to competitive bidding while preserving the bid of the Stalking Horse Bidder, thereby providing a floor price for the Assets. The Bidding Procedures, in the Debtor's opinion, will ensure the Debtor receives the highest or otherwise best offer for its assets and will maximize the value of the Assets for the Debtor's estate.

## Breakup Fee and Expense Reimbursement

31.     In recognition of the value of having a stalking horse bidder, the risk of approval of a higher and better bid, and the extensive time and expense incurred by the Stalking Horse Bidder in conducting due diligence and in negotiations with the Debtor, the Stalking Horse APA provides that in the event the Court approves a sale to another party, the Stalking Horse Bidder will be paid a Breakup Fee and Expense Reimbursement as more fully described in paragraph 26(b) above and Section 8.01(a) of the Stalking Horse APA.

32.     The Stalking Horse Bidder was unwilling to enter into the Stalking Horse APA without the inducement of the Break-Up Fee and Expense Reimbursement on these terms. Without the Stalking Horse Bidder, the Debtor would not be able to obtain a sale price of at least the purchase price, thus, the Break-Up Fee and Expense Reimbursement preserve value of the Stalking Horse Bid for the estate. *See Corradino v. Lamb (In re Lamb)*, 2002 WL 31508913, at *2 (Bankr. D. Md. 2002) (stating that a break-up fee should be in the best interest of the estate and necessary).

33.     The Break-Up Fee and Expense Reimbursement are the result of good faith, arm's-length negotiation between the Debtor and the Stalking Horse Bidder. *See In re Integrated Resources Inc.,* 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d

Cir. 1993); *In re 995 Fifth Ave. Assoc.*, *L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (upholding a break-up fee that was the result of good faith, arm's-length agreement and not tainted by self-dealing).

34.    The proposed Break-Up Fee and Expense Reimbursement are a fair and reasonable percentage in relation to the proposed purchase price, and the funds and efforts expended by the Stalking Horse Bidder to consummate this transaction. *See In re Hupp Indus. Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). Under the circumstances, the Debtor believes that the Breakup Fee and Expense Reimbursement are a fair, reasonable and necessary cost of the administration of the estate and should be approved.

**Procedures for the Assumption and Assignment of Assumed Contracts**

35.    At the closing, the Debtor intends to assume and assign to the Successful Bidder (as defined below), certain executory contracts and unexpired leases (the "Assumed Contracts")[3] to be identified in the Cure Notice (as defined below) and on certain schedules to the Stalking Horse APA (*i.e.*, the Assumed Contracts).[4] The list of Assumed Contracts will be attached to the Cure Notice, provided, however, the bidder submitting the highest or best bid (the "Successful Bidder") may add to the list of Assumed Contracts (so long as the Debtor files and serves a Cure Notice on each affected contract counterparty within ten (10) calendar days before the Sale Hearing), and may remove any executory contract or lease from the list of Assumed Contracts until seven (7) calendar days prior to the closing of the sale.

---

[3]    As applicable to the Stalking Horse Bidder, the term Assumed Contracts as used herein shall have the same meaning as "Assigned Contract" in the Stalking Horse APA.

[4]    The inclusion of any agreement in the list of Assumed Contracts does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included in the list of Assumed Contracts.

36.     The Debtor proposes to serve a Notice (the "Cure Notice"), in substantially the form attached hereto as **Exhibit 4**, on the counterparties to the Assumed Contracts no later than three (3) business days after entry of the Order approving the Bidding Procedures.  The Cure Notice also will identify the amounts, if any, that the Debtor believes are owed to each of the counterparties to the Assumed Contracts in order to cure any defaults that exist under (and to otherwise reinstate without default) such contract (the "Cure Costs").  The Debtor will state in the Cure Notice the date by which any objection to the Cure Costs or the assumption and assignment of the Assumed Contract (including with respect to adequate assurance of future performance) must be filed and served (the "Cure Objection Deadline"), which the Debtor proposes to be  seven (7) days before the Sale Hearing.  If a contract or lease is assumed and assigned pursuant to the Court's order approving same, then unless the affected counterparty properly files and serves an objection to the Cure Costs contained in the Cure Notice, the counterparty will receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made pursuant to the terms of the asset purchase agreement with the Successful Bidder.  If an objection is timely filed by a counterparty to an Assumed Contract with respect to the amount of the Cure Costs set forth in the Cure Notice, the Debtor proposes that such objection must attach a copy of the relevant contract (with all amendments) set forth a specific default under the Assumed Contract and claim a specific monetary amount that differs from the amount (if any) specified by the Debtor in the Cure Notice or, alternatively, state why the counterparty believes any Cure Costs are owing, and state the basis for any other objection to the assumption and assignment of the Assumed Contract.

#2166417v.3

37.     The Successful Bidder will pay any Cure Costs that may be owed to any counterparty to the Assumed Contracts in accordance with the terms of its asset purchase agreement.  The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts.  The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing.  The Debtor further proposes that Cure Costs disputed by any counterparty be resolved by the Court at the Sale Hearing.

38.     Except to the extent otherwise provided in the agreement with the Successful Bidder, subject to the payment of any Cure Costs, the Successful Bidder, as assignee of an Assumed Contract, will not be subject to any liability to the assigned contract counterparty that accrued or arose before the closing date of the sale of the Assets and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

## Notice of Bidding Procedures, Auction and Sale Hearing

39.     The Debtor requests that the Court schedule the Sale Hearing on within 35 days of the filing of this Motion.  The Debtor proposes that objections, if any, to the Sale Motion be filed no later than seven (7) days before the Sale Hearing.

40.     The Debtor requests that the Court approve the manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as **Exhibit 5** (the "Sale and Bidding Procedures Notice"), which the Debtor will serve on the following parties: (a) the U.S. Trustee; (b) counsel to the Committee (or if none, to the members

#2166417v.3

of the Committee) and the 20 largest unsecured creditors; (c) the Trustees of the ESOP; (d) the Trustees of the Pension Plan; (e) counsel to Bank of America, N.A.; (f) counsel to ACP-1, L.P.; (g) all parties known to be asserting a lien (which includes Bank of America, N.A. and ACP-1, L.P.) on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on the Debtor's assets; (h) all known counterparties to the Assumed Contracts (including Toyota Motor Corporation); (i) all entities known to have expressed an interest in bidding on the Assets; (j) the United States Attorney's Office for the District of Maryland; (k) the Securities and Exchange Commission; (l) the Pension Guaranty Corporation; (m) the state taxing authorities in Maryland and Nevada and the Internal Revenue Service; (n) the state attorney generals of Maryland and Nevada; (o) the U.S. Environmental Protection Agency; (p) the Maryland Department of the Environment; (q) the U.S. Department of Labor-OSHA; (r) the Maryland Occupational Safety and Health (MOSH); and (s) all other parties that have filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bidding Procedures Order.

41.     The Debtor also proposes to serve a Notice (the "Creditor Notice") substantially in the form attached hereto as **Exhibit 6** on all known creditors of the Debtor.

42.     The Debtor proposes to serve the Sale and Bidding Procedures Notice and the Creditor Notice within three (3) business days from the date of entry the Bidding Procedures Order, by first-class mail, postage prepaid, on the appropriate parties as described above. Both the Sale and Bidding Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of this Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Tydings & Rosenberg LLP, 100

14

E. Pratt Street, 26th Floor, Baltimore, MD 21202, attention: Alan M. Grochal and Stephen M. Goldberg.

43.    Assuming that the Court approves the schedule proposed in this Motion, the Debtor submits that no other or further notice should be required. The Debtor submits that such notice is sufficient, and requests that the Court find that no further notice of the relief requested herein is required.

## Sale Hearing

44.    At the Sale Hearing, the Debtor will seek Court approval of the sale of the assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than any permitted encumbrances) with all such liens, claims, encumbrances and interests to attach to the proceeds of the sale, except as otherwise provided, with the same validity and in the same order of priority as they attached to the assets prior to the sale, including the assumption by the Debtor and assignment to the Successful Bidder of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code. The Debtor will present additional evidence, as necessary, at the Sale Hearing and submit that the relief sought herein, including the sale of the Assets and related assumption and assignment of the Assumed Contracts is fair, reasonable and in the best interest of the Debtor's estate.

## Relief Requested

45.    Pursuant to this Motion, the Debtor requests that the Court, among other things: (a) approve the Bidding Procedures for the sale of substantially all of the Debtor's assets, (b) authorizing and scheduling an auction; (c) scheduling a hearing for approval of the sale of the Assets free and clear of liens and the assumption of certain executory contracts and unexpired leases to successful bidder;   (d) approve the payment of the Breakup Fee and Expense

15

Reimbursement to the Stalking Horse Bidder, on the terms set forth above in paragraph 26(b) and Section 8.01(a) of the Stalking Horse APA.; (e) approving procedures and setting deadlines for the assumption and assignment of executory contracts and unexpired leases, including cure amount relating thereto and (f) approve certain deadlines and the form, manner and sufficiency of the Sale and Bidding Procedures Notice, the Creditor Notice and the Cure Notice.

       **WHEREFORE**, the Debtor requests that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:  April 4, 2014

/s/ Alan M. Grochal

Alan M. Grochal, Bar No. 01447
Stephen M. Goldberg, Bar No. 1156
Catherine K. Hopkin, Bar No. 28257
Tydings & Rosenberg, LLP
100 East Pratt Street, 26th Floor
Baltimore, Maryland 21202
Telephone:  410-752-9700
Facsimile:  410-722-5460
emails: agrochal@tydingslaw.com
sgoldberg@tydingslaw.com
chopkin@tydingslaw.com
Counsel for Debtor and Debtor in Possession

#2166417v.3