ASSET PURCHASE AGREEMENT

between

HEDWIN CORPORATION

Seller

and

FUJIMORI KOGYO CO., LTD.

Buyer

_____

dated as of

April 1, 2014



## TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| ARTICLE II | PURCHASE AND SALE | 8 |
| Section 2.01 | Purchase and Sale of Assets. | 8 |
| Section 2.02 | Excluded Assets | 10 |
| Section 2.03 | Assumed Liabilities | 11 |
| Section 2.04 | Excluded Liabilities | 11 |
| Section 2.05 | Assignment of Contracts | 12 |
| Section 2.06 | Purchase Price | 13 |
| Section 2.07 | Purchase Price Adjustment. | 13 |
| Section 2.08 | Allocation of Purchase Price | 14 |
| ARTICLE III | CLOSING | 15 |
| Section 3.01 | Closing | 15 |
| Section 3.02 | Closing Deliverables. | 15 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF SELLER | 16 |
| Section 4.01 | Organization and Qualification of Seller | 16 |
| Section 4.02 | Authorization and Validity | 16 |
| Section 4.03 | No Conflicts; Consents | 16 |
| Section 4.04 | Financial Statements | 17 |
| Section 4.05 | Title to Purchased Assets | 17 |
| ARTICLE V | REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGMENTS OF BUYER | 17 |
| Section 5.01 | Organization of Buyer | 17 |
| Section 5.02 | Authority of Buyer | 17 |
| Section 5.03 | No Conflicts; Consents | 17 |
| Section 5.04 | Brokers | 17 |
| Section 5.05 | Legal Proceedings | 18 |
| Section 5.06 | Buyer Broker Fees | 18 |
| Section 5.07 | No Known Breach by Seller | 18 |

i

| | | |
|---|---|---|
| Section 5.08 | Acknowledgement Purchased Assets Acquired "AS IS" | 18 |
| Section 5.09 | Availability of Funds | 18 |
| Section 5.10 | No Other Representations or Warranties of Seller | 18 |
| **ARTICLE VI** | **ACTIONS PRIOR TO CLOSING DATE** | **19** |
| Section 6.01 | Investigation of the Business By Buyer | 19 |
| Section 6.02 | Operations Prior to the Closing Date | 19 |
| Section 6.03 | Third Party Consents | 20 |
| Section 6.04 | Governmental Approvals | 20 |
| Section 6.05 | Non-competition | 21 |
| Section 6.06 | Notice of Developments | 21 |
| **ARTICLE VII** | **ADDITIONAL AGREEMENTS** | **21** |
| Section 7.01 | Taxes | 21 |
| Section 7.02 | Collections after Closing | 21 |
| Section 7.03 | Employee Matters | 22 |
| Section 7.04 | Post-Closing Cooperation and Access to Books and Records | 22 |
| Section 7.05 | Post-Closing Tax Returns | 23 |
| Section 7.06 | Indemnification By Seller | 23 |
| Section 7.07 | Indemnification By Buyer | 23 |
| Section 7.08 | Limitations to Indemnification | 23 |
| Section 7.09 | Indemnification Procedure | 24 |
| Section 7.10 | Tax Treatment of Indemnification Payments | 24 |
| Section 7.11 | Waiver of Bulk Sales Act | 24 |
| Section 7.12 | Further Assurances | 24 |
| **ARTICLE VIII** | **CONDITIONS TO CLOSING** | **25** |
| Section 8.01 | Bankruptcy Conditions | 25 |
| Section 8.02 | Conditions to Obligations of Buyer | 28 |
| Section 8.03 | Conditions to Obligations of Seller | 29 |
| **ARTICLE IX** | **TERMINATION AND OTHER REMEDIES** | **29** |
| Section 9.01 | Termination | 29 |
| Section 9.02 | Effect of Termination | 30 |

| | | |
|---|---|---|
| **ARTICLE X** | **MISCELLANEOUS** ............................................................................. | **31** |
| **Section 10.01** | Confidential Nature of Obligations ............................................... | 31 |
| **Section 10.02** | Survival ......................................................................................... | 31 |
| **Section 10.03** | Expenses........................................................................................ | 31 |
| **Section 10.04** | Notices .......................................................................................... | 31 |
| **Section 10.05** | Interpretation ............................................................................... | 32 |
| **Section 10.06** | Headings ....................................................................................... | 32 |
| **Section 10.07** | Severability .................................................................................. | 33 |
| **Section 10.08** | Entire Agreement ......................................................................... | 33 |
| **Section 10.09** | Assignment ................................................................................... | 33 |
| **Section 10.10** | No Third Party Beneficiaries ...................................................... | 33 |
| **Section 10.11** | Amendment and Modification; Waiver ....................................... | 33 |
| **Section 10.12** | Governing Law; Jurisdiction; Waiver of Jury Trial ................. | 33 |
| **Section 10.13** | Counterparts ................................................................................ | 34 |
| **Section 10.14** | Time of Essence ........................................................................... | 34 |
| **Section 10.15** | Disclosure Schedules ................................................................... | 34 |
| **Section 10.16** | No Recourse.................................................................................. | 34 |

**DISCLOSURE SCHEDULES TO ASSET PURCHASE AGREEMENT**
Schedule 2.01(a)
Schedule 2.01(a)(iii)
Schedule 2.01(a)(v)
Schedule 2.01(a)(vi)
Schedule 2.01(a)(vii)
Schedule 2.01(a)(viii)
Schedule 2.02(m)
Schedule 2.03(f)
Schedule 2.05(b)
Schedule 2.07(a)(i)
Schedule 4.01
Schedule 7.03

**EXHIBITS TO ASSET PURCHASE AGREEMENT**

| | |
|---|---|
| EXHIBIT A | Bidding Procedures Order |
| EXHIBIT B | Escrow Agreement |
| EXHIBIT C | Bill of Sale |
| EXHIBIT D | Sale Order |

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of April 1, 2014, is entered into by and between **HEDWIN CORPORATION**, a Maryland corporation ("**Seller**"), and **FUJIMORI KOGYO CO., LTD.**, a Japanese corporation ("**Buyer**"). Seller and Buyer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties.**"

### RECITALS

**WHEREAS**, Seller is engaged in the business of manufacturing and selling customized industrial plastic packaging products (the "**Business**"); and

**WHEREAS**, on _____, 2014 (the "**Petition Date**"), Seller commenced a case (the "**Bankruptcy Case**") under Chapter 11 of the United States Bankruptcy Code (as amended, the "**Bankruptcy Code**"), 11 U.S.C. §§ 101 *et seq.*, by filing a voluntary petition in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**"), Case no. _____; and

**WHEREAS**, since the commencement of the Bankruptcy Case, Seller has continued in possession of its property and has continued to operate and manage its Business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all of the assets, and assume certain specified liabilities, of the Business, all in the manner and subject to the terms and conditions set forth in this Agreement, the Bidding Procedures Order (as defined below), and the Sale Order (as defined below), and in accordance with sections 105, 363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Accounts Receivable**" has the meaning set forth in **Section 2.01(a)(i)**.

"**Action**" means any legal action, cause of action, lawsuit, or arbitration, or any inquiry, proceeding or investigation by or before any Governmental Authority.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Allocation Schedule**" has the meaning set forth in **Section 2.08**.

"**Alternative Transaction**" has the meaning set forth in **Section 8.01(b)**.

"**Alternative Transaction Proceeds**" has the meaning set forth in **Section 8.01(a)(ii)**.

"**Assigned Contracts**" has the meaning set forth in **Section 2.01(a)(iv)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.03**.

"**Auction**" has the meaning set forth in **Section 8.01(b)(iii)**.

"**Avoidance Claims**" means any and all causes of action, claims, rights and remedies, existing or arising under the Bankruptcy Code or applicable non-bankruptcy law for the avoidance of or recovery for

preferential transfers or fraudulent conveyances including, without limitation, any and all present and future claims and causes of action arising under Chapter 5 of the Bankruptcy Code.

"**Baltimore Facility**" means the Leased Real Property of Seller located in Baltimore, Maryland.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals

"**Benefit Plan**" means any and all benefit, retirement, compensation, profit-sharing, deferred compensation, incentive, performance award, phantom equity, stock-based, change in control, retention, severance, paid time off, fringe-benefit and other similar agreements, plans, policies, programs or arrangements, in each case whether or not reduced to writing and whether funded or unfunded, whether or not an "employee benefit plan" within the meaning of § 3(3) of ERISA, whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller or an ERISA Affiliate of Seller for the benefit generally of current employees, officers, directors, retirees, independent contractors or consultants of the Business or spouses or dependents of any of the foregoing, or under which Seller has or may have any Liability.

"**Bid Deadline**" has the meaning set forth in **Section 8.01(b)(i)(D)**.

"**Bidding Procedures Motion**" means the motion to be filed with the Bankruptcy Court by Seller, substantially in the form of **Exhibit A** attached hereto, seeking approval of the Break-Up Fee and the Expense Reimbursement and the establishment of bidding procedures as contemplated pursuant to **Article VIII**.

"**Bidding Procedures Order**" means an Order or Orders, substantially in the form of **Exhibit A** attached hereto, entered by the Bankruptcy Court granting the Bidding Procedures Motion and approving the bidding procedures relating to the sale of the Business assets as contemplated pursuant to **Article VIII**.

"**BI Insurance**" has the meaning set forth in **Section 2.01(a)(xii)**.

"**Bill of Sale**" has the meaning set forth in **Section 3.02(a)(ii)**.

"**Books and Records**" has the meaning set forth in **Section 2.01(a)(xi)**.

"**Break-Up Fee**" has the meaning set forth in **Section 8.01(a)**.

"**Business**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Baltimore, Maryland are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble to this Agreement.

"**Buyer Indemnitees**" has the meaning set forth in **Section 7.06**.

"**Buyer Plans**" has the meaning set forth in **Section 7.03(b)**.

"**Buyer Termination Notice**" has the meaning set forth in **Section 9.01(c)(ii)**.

"**Cash Consideration**" has the meaning set forth in **Section 2.06**.

"**Closing**" has the meaning set forth in **Section 3.01**.

"**Closing Date**" has the meaning set forth in **Section 3.01**.

"**Closing Net Asset**" means: (a) the assets of the Business to the extent included in the Purchased Assets, less (b) the liabilities of the Business to the extent included in the Assumed Liabilities (and specifically including the Cure Costs), determined as of the close of business on the Closing Date.

"**Closing Net Asset Statement**" has the meaning set forth in **Section 2.07(a)(i)**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Consent Pending Contract**" has the meaning set forth in **Section 2.05(b)**.

"**Contracts**" means any and all legally binding agreements, commitments, contracts, indentures, instruments, Leases, licenses, and other obligations or undertakings, whether written or oral.

"**Copyrights**" means all United States and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals and extensions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

"**Cure Costs**" has the meaning set forth in **Section 2.05(a)**.

"**Deposit**" has the meaning set forth in **Section 2.06(a)**.

"**Deposit Agent**" has the meaning set forth in **Section 2.06(a)**.

"**Deposit Escrow Agreement**" has the meaning set forth in **Section 2.06(a)**.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"**Disputed Amounts**" has the meaning set forth in **Section 2.07(b)(iii)**.

"**Dollars or $**" means the lawful currency of the United States.

"**Domain Names**" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet.  A Domain Name may or may not also be a Trademark.

"**Eligible Employees**" has the meaning set forth in **Section 7.03(a)**.

"**Employee Records**" means any and all books, files and records held or otherwise owned by Seller that relate to current or former employees and other personnel, including, without limitation, books, files and records that relate to medical history, medical insurance or other medical matters and to workers' compensation, and to the evaluation, appraisal or performance of current or former employees and other personnel of Seller.

"**Encumbrance**" means any lien under section 101(37) of the Bankruptcy Code and any other charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.  The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response,

Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 *et seq.*; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 *et seq.*; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 *et seq.*; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 *et seq.*; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 *et seq.*; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 *et seq.*; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 *et seq.*

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means, with respect to any Person, any other Person that, together with such first Person, would be treated as a single employer, within the meaning of sections 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" means the entity agreed between the Parties to serve as escrow agent under the Escrow Agreement.

"**Escrow Agreement**" means the Escrow Agreement among Buyer, Seller and the Escrow Agent, to be executed and delivered at the Closing in the form attached hereto as **Exhibit B**.

"**Escrow Amount**" means the sum of $2,625,000 to be deposited with the Escrow Agent and held in escrow pursuant to the Escrow Agreement.

"**Excluded Assets**" has the meaning set forth in **Section 2.02**.

"**Excluded Contracts**" has the meaning set forth in **Section 2.02(c)**.

"**Excluded Liabilities**" has the meaning set forth in **Section 2.04**.

"**Expense Reimbursement**" has the meaning set forth in **Section 8.01(a)**.

"**Extraordinary Events**" means (a) acts of God; (b) flood, fire, earthquake or explosion; and (c) war, invasion, hostilities, terrorist threats or acts, riot or other civil unrest.

"**Financial Statements**" has the meaning set forth in **Section 4.04**.

"**Fire**" means the fire at the Baltimore Facility that occurred in June, 2013.

"**Fire Damage Insurance Claims**" means any and all insurance claims of Seller relating to or arising out of losses sustained by Seller as a result of the Fire.

"**GAAP**" means United States generally accepted accounting principles and, to the extent that options exist under those principles, then consistent with those accounting methods, practices, principles and policies historically applied by Seller.

"**Governmental Authority**" means any federal, state, local, foreign or other government, or any agency or instrumentality of such government or political subdivision, any multinational organization or body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law or which is exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority power or authority), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

4

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Indemnified Party**" has the meaning set forth in **Section 7.09**.

"**Indemnifying Party**" has the meaning set forth in **Section 7.09**.

"**Independent Accountants**" has the meaning set forth in **Section 2.07(b)(iii)**.

"**Intellectual Property**" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world: (a) Trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered or unregistered, and all registrations and applications for registration of such Trademarks, including intent-to-use applications, all issuances, extensions and renewals of such registrations and applications and the goodwill connected with the use of and symbolized by any of the foregoing; (b) internet Domain Names, whether or not Trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority; (c) original works of authorship in any medium of expression, whether or not published, all Copyrights (whether registered or unregistered), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (d) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; (e) Patents, patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications; and (f) all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing.

"**Intellectual Property Assets**" means all Intellectual Property owned by Seller, used in or necessary for the operation of the Business as currently conducted.

"**Intellectual Property Licenses**" means all licenses, sublicenses and other agreements by or through which other Persons, grant Seller exclusive or non-exclusive rights or interests in or to any Intellectual Property Assets.

"**Interim Balance Sheet**" means the balance sheet of the Business as of December 31, 2013.

"**Interim Balance Sheet Date**" means the date of the Interim Balance Sheet.

"**Inventory**" has the meaning set forth in **Section 2.01(a)(ii)**.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" means all real property which is subject to a Lease, pursuant to which Seller occupies real property used in the operation of the Business.

"**Leases**" means all leases and other occupancy agreements for Leased Real Property.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Material Adverse Effect**" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("**Effect**"), individually or in the aggregate, that has, or is reasonably likely to have, a material adverse effect on the Purchased Assets or the Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole; *provided, however*, that "Material Adverse Effect" shall not include the following, nor shall any of the following be taken into account in determining whether there has been a

Material Adverse Effect: (a) events or conditions that generally affect the industry in which Seller operates; (b) general business or economic conditions; (ci) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any actual or threatened military or terrorist attack; (d) the conditions of any financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (e) changes in GAAP; (f) acts or omissions of Seller carried out (or omitted to be carried out) in accordance with this Agreement; (g) any Effect caused by events, changes or developments relating to the transactions contemplated by this Agreement or the announcement thereof; or (h) any condition arising by reason of commencement of the Bankruptcy Case or Seller operating as a debtor in possession thereunder; unless, in the case of clause (a), (b), (c), (d) or (e) above only, such Effect would reasonably be expected to result in a materially disproportionate adverse effect on, or change in, the Business, taken as a whole, relative to the businesses of other comparable companies in the industries in which the Business operates.

"**Non-Assured Contracts**" has the meaning set forth in **Section 8.01(e)(iv)**.

"**Non-Recourse Party**" has the meaning set forth in **Section 10.16**.

"**Ordinary Course of Business**" means the ordinary and usual course of day-to-day operations of the Business through the date hereof consistent with past practice.

"**Owned Real Property**" means all real property owned by Seller and used in or necessary for the conduct of the Business as currently conducted (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto).

"**Party**" has the meaning set forth in the preamble to this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Patents**" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from any Governmental Authority.

"**Permitted Encumbrances**" means (a) statutory liens for current property Taxes and assessments not yet due and payable or being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP, including liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Seller; (b) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto; (c) Encumbrances that constitute or secure Assumed Liabilities (including Encumbrances arising under the Assigned Contracts); (d) Encumbrances, title exceptions or other imperfections of title caused by or resulting from the acts of Buyer or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees; (e) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the ordinary course of business with respect to amounts not yet overdue or amounts being contested in good faith by appropriate Proceedings; (f) local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to the Leased Real Property, which would not have a Material Adverse Effect; and (g) the Encumbrances listed in **Section 2.01(a)** of the Disclosure Schedules.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Petition Date**" has the meaning set forth in the preamble to this Agreement.

"**Post-Closing Adjustment**" has the meaning set forth in **Section 2.07(a)(ll)**.

"**Purchase Price**" has the meaning set forth in **Section 2.06**.

"**Purchased Assets**" has the meaning set forth in **Section 2.01**.

"**Qualified Bid**" has the meaning set forth in **Section 8.01(b)(i)**.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Repair Escrow**" has the meaning set forth in **Section 7.11**.

"**Repair Escrow Agreement**" means the Repair Escrow Agreement among Buyer, Seller and the Deposit Agent, to be executed and delivered at the Closing in the form to be agreed among the parties thereto consistent with **Section 7.11**.

"**Repair Escrow Amount**" means the sum of $500,000 or the approved quote for the Repair and Replacements to be obtained from the insurers of Seller or their consultant prior to the Closing Date, whichever is greater, to be deposited with the Deposit Agent and held in escrow pursuant to the Repair Escrow Agreement.

"**Repairs and Replacements**" has the meaning set forth in **Section 7.11**.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Requested Party**" has the meaning set forth in **Section 7.04(b)**.

"**Resolution Period**" has the meaning set forth in **Section 2.07(b)(ii)**.

"**Review Period**" has the meaning set forth in **Section 2.07(b)(i)**.

"**Sale Hearing**" means the hearing or hearings held by the Bankruptcy Court to consider the transactions contemplated by this Agreement.

"**Sale Motion**" means the motion to be filed with the Bankruptcy Court by Seller, seeking (a) approval of the terms and provisions of this Agreement, (b) authorization for (i) the sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code and (ii) the assumption and assignment of the Purchased Assets that are executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, and (c) any other provisions acceptable to Buyer.

"**Sale Order**" has the meaning set forth in **Section 8.01(d)**.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Seller Indemnitees**" has the meaning set forth in **Section 7.07**.

"**Seller Termination Notice**" has the meaning set forth in **Section 9.01(d)(i)**.

"**Seller's Knowledge**" or any other similar knowledge qualification, means the actual knowledge of any of Richard F. Broo, Maurice LeCompte, Joseph Wolfson, Theresa LiPira and Charles Deutchman, after due inquiry.

"**Starting Auction Bid**" has the meaning set forth in **Section 8.01(b)(iii)**.

"**Statement of Objections**" has the meaning set forth in **Section 2.07(b)(ii)**.

"**Tangible Personal Property**" has the meaning set forth in **Section 2.01(a)(vi)**.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp,

occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Territory**" means North America, South and Central America, Europe and The People's Republic of China.

"**Trademarks**" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names (including all assumed or fictitious names under which the Business is conducted), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

"**Transaction Documents**" means this Agreement, the Deposit Escrow Agreement, the Escrow Agreement, the Bill of Sale, and the other agreements, instruments and documents required to be delivered at the Closing.

"**Transfer**" has the meaning set forth in **Section 2.05(b)**.

"**Transfer Taxes**" means any and all sales, documentary, excise, use, transfer and other similar Taxes (excluding any Taxes imposed on the basis of income, profit or gross receipts of the Business) that are incurred or imposed by reason of the sale, transfer, assignment and registrations of pending delivery of the Purchased Assets to Buyer. For the avoidance of doubt, Transfer Taxes excludes all taxes incurred or imposed by reason of the sale, transfer, assignment and delivery of any assets other than the Purchased Assets or pursuant to any transactions other than the transaction contemplated in this Agreement.

"**Transferred Employees**" has the meaning set forth in **Section 7.03(a)**.

"**Undisputed Amounts**" has the meaning set forth in **Section 2.07(b)(iii)**.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses, as amended from time to time.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01**          **Purchase and Sale of Assets.**

(a)          Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in, to and under the Purchased Assets on a "AS IS" and "WHERE IS" basis, WITH ALL FAULTS and, except as otherwise specifically set forth in this Agreement, with NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER (EXPRESS OR IMPLIED), INCLUDING NO REPRESENTATIONS AS TO MERCHANTABILITY, FITNESS OR USE FOR A PARTICULAR PURPOSE; *provided, however*, the Purchased Assets shall be free and clear of any Encumbrances (other than Permitted Encumbrances and as listed on **Section 2.01(a)** of the Disclosure Schedules) to the extent permissible under section 363(f) of the Bankruptcy Code.  The term "**Purchased Assets**" means all of Seller's right, title and interest in, to and under all of the assets, properties and rights (other than Excluded Assets) of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired, owned, leased, licensed or used or held for use in or relating to the operation of the Business as of the Closing Date, but in all cases only to the extent same are transferrable or assignable by Seller pursuant to their terms, sections 363 or 365 of the Bankruptcy Code, or

8

other applicable Law.  Without limiting the generality of the foregoing, the Purchased Assets include, without limitation, the following:

        (i)     all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing ("**Accounts Receivable**");

        (ii)     all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("**Inventory**");

        (iii)     all Contracts, Leases and Intellectual Property Licenses to which Seller is a party, including all Leases and Intellectual Property Licenses listed on **Section 2.01(a)(iii)** of the Disclosure Schedules, but excluding Contracts, Leases and Intellectual Property Licenses excluded from assignment pursuant to **Section 2.01(b)**;

        (iv)     all Contracts, Leases and Intellectual Property Licenses made or entered into after the date hereof by Seller with respect to the Business in the ordinary course not in violation of this Agreement and not excluded from assignment pursuant to **Section 2.01(b)** (the Contracts described in **Section 2.01(a)(iii)** and **Section 2.01(a)(iv)** being hereinafter defined as the "**Assigned Contracts**");

        (v)     all Intellectual Property Assets, including those listed on **Section 2.01(a)(v)** of the Disclosure Schedules;

        (vi)     all furniture, fixtures, equipment, machinery, tools, spare parts, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "**Tangible Personal Property**"), including the property listed on **Section 2.01(a)(vi)** of the Disclosure Schedules except as consumed, sold, used or disposed of in the Ordinary Course of Business;

        (vii)     all Owned Real Property and Leased Real Property, including the property listed on **Section 2.01(a)(vii)** of the Disclosure Schedules;

        (viii)     all Permits, including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets, including those described in **Section 2.01(a)(viii)** of the Disclosure Schedules;

        (ix)     all rights relating to deposits, prepaid expenses and claims for refunds, rebates and credits, and all rights of offset in respect thereof, that are not Excluded Assets;

        (x)     all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

        (xi)     to the extent permitted by applicable Law, originals, or where not available, copies, of all books and records, including, without limitation, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and intellectual property files relating to the Intellectual Property Assets and the Intellectual Property Licenses ("**Books and Records**"); but excluding Books and Records relating to Excluded Assets and Employee Records (other than for employees hired or retained by Buyer); however, Seller agrees to provide reasonable access to any books and records not conveyed hereunder or retained by the Seller;

        (xii)     All rights to payment under the business interruption insurance policy of Seller (the "**BI Insurance**") related to times when the operations of Buyer are suspended to enable work on the Repairs and Replacements to be accomplished after the Closing; and

        (xiii)     all goodwill, the going concern value of the Business, and all other intangibles of the Business.

(b)    At any time before the earlier of the date the Sale Order is entered or ten (10) Business Days prior to the Closing, Buyer, in its discretion by written notice to Seller, may exclude from being assigned pursuant to this Agreement and the Sale Order any Contract or Lease, and, in such circumstances, such Contracts or Leases shall not constitute Assigned Contracts (and shall constitute Excluded Assets), and Buyer shall not acquire any rights or assume any Liabilities with respect thereto. Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to exclude from being assigned any Contracts or Leases pursuant to the preceding sentence.

(c)    Upon Buyer's reasonable request, Seller shall provide additional information as to the Liabilities under the Contracts and Leases sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Contracts or Leases hereunder.

**Section 2.02        Excluded Assets.** Notwithstanding anything in **Section 2.01** to the contrary, nothing in this Agreement shall be deemed to sell, transfer, assign or convey (or require Seller to do any of the foregoing as to) the following assets to Buyer, and Seller shall retain all of their respective rights, title and interests in, to and under, and Buyer shall have no rights with respect to, any of the following assets existing as of the Closing Date (collectively, the "**Excluded Assets**"):

(a)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits;

(b)    all bank accounts of Seller;

(c)    all Contracts that are not Assigned Contracts (the "**Excluded Contracts**");

(d)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(e)    all Avoidance Claims (including Actions relating thereto), all rights, claims or causes of action of Seller against third parties relating to the Excluded Assets, and all rights, claims and causes of action of Seller against former officers, directors, employees, members, principals, agents, and representatives of Seller arising out of events occurring prior to the Closing Date, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date; *provided, however,* that notwithstanding anything to the contrary in this Agreement, Seller releases, and covenants not to assert, Avoidance Claims (including Actions relating thereto) against (x) any counter party to an Assigned Contract or (y) any supplier who has received from Seller aggregate consideration greater than or equal to $400,000 for each of the two most recent fiscal years;

(f)    all shares of capital stock or other equity interests of Seller, or any securities convertible into, exchangeable or exercisable for share of capital stock or other equity interests of Seller;

(g)    all Benefit Plans and assets attributable thereto;

(h)    except as set forth in **Section 2.01(a)(xii)**, all insurance policies or rights to proceeds, refunds or rebates therefrom, including any tail insurance policies that provide coverage to Seller or its Representatives after the Closing, or which relate to or cover Liabilities that are not among the Assumed Liabilities and any Fire Damage Insurance Claims, and the proceeds therefrom (including all rights to payments under the BI Insurance related to times when the operations of Seller are suspended to enable work on the repairs and replacements to be accomplished or to be accomplished on or prior to the Closing);

(i)    all rights, claims and causes of action which accrue or will accrue to Seller under the Transaction Documents;

(j)    all Employee Records (other than for those employees hired or retained by Buyer);

(k)    all retainers paid by Seller to professionals including, without limitation, accountants, attorneys and other consultants and advisors, in connection with the Bankruptcy Case or the transactions contemplated by this Agreement;

(l)    the Purchase Price delivered (or required to be delivered) to Seller pursuant to this Agreement; and

(m)    all other assets listed or described on **Section 2.02(m)** of the Disclosure Schedules.

**Section 2.03    Assumed Liabilities.** Subject to the terms and conditions set forth herein, at the Closing, effective as of the Closing, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(a)    all Liabilities arising after the Closing with respect to the Purchased Assets or the operation of the Business following Closing;

(b)    all Liabilities under the Leases of Leased Real Property and under the other Assigned Contracts;

(c)    all Cure Costs and other obligations under section 365 of the Bankruptcy Code to provide adequate assurance of future performance with respect to Assigned Contracts;

(d)    any Liabilities for remediation activities required under Environmental Laws, to the extent arising out of or relating to the existence or Release of Hazardous Materials identified by the Phase 2 environmental audit of Baltimore Facility conducted on or about March 18, 2014;

(e)    all trade accounts payable of Seller to third parties in connection with the Business that remain unpaid as of the Closing Date and that either are reflected on the Interim Balance Sheet or arose in the Ordinary Course of Business since the Interim Balance Sheet Date, but in any event except to the extent asserted pursuant to section 502(h) of the Bankruptcy Code; and

(f)    all other Liabilities set forth in **Section 2.03(f)** of the Disclosure Schedules.

**Section 2.04    Excluded Liabilities.** Notwithstanding any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include, without limitation, the following:

(a)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Bidding Procedures Motion, the Bidding Procedures Order, the Sale Motion, the Sale Order, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    all Taxes (whether assessed or unassessed) applicable to the Business and the Purchased Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date;

(c)    any Liabilities relating to or arising out of the Excluded Assets;

(d)    other than as specifically set forth herein, any Liabilities relating to any events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business) including all pending or threatened Actions relating thereto;

(e)    any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

(f)    any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

(g)      any Liabilities of Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(h)      except as set forth in **Section 2.03(a)**, any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments (or that become owing to such employees upon the termination of their employment including all Liability arising under the WARN Act);

(i)      except as set forth in **Section 2.03(d)**, any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(j)      any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets issued by the Business' customers to Seller on or before the Closing; (ii) did not arise in the Ordinary Course of Business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(k)      any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same), except for indemnification of same pursuant to **Section 7.07** as Seller Indemnitees;

(l)      any Liabilities under the Excluded Contracts;

(m)      any pension or retirement Liabilities of Seller to its current or former employees which are accrued as of the Closing Date, whether or not under any Benefit Plan;

(n)      any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions;

(o)      any Liabilities arising out of, in respect of or in connection with the failure by Seller to comply with any Law or Governmental Order; and

(p)      any Liabilities incurred by Seller (including the cost of repair and replacement of equipment, machinery and other assets of Seller that are damaged) as a result of the fire at the Baltimore Facility in June, 2013.

**Section 2.05      Assignment of Contracts.**

(a)      Seller shall assume and assign all Assigned Contracts to Buyer as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order. In connection with such assumption and assignment, Seller shall provide to all non-debtor parties to Assigned Contracts, and the Sale Order shall find that the Seller provided, timely and proper written notice of the procedures for assumption and assignment thereof by Seller, including proposed amounts necessary to cure all monetary defaults under such Assigned Contracts and to compensate for all actual or pecuniary losses resulting from such defaults to the extent required by section 365(b) of the Bankruptcy Code (such amounts, the "**Cure Costs**"). Seller shall take all other actions reasonably necessary to cause all Assigned Contracts to be assumed by Seller and assigned to Buyer pursuant to section 365 of the Bankruptcy Code, although it is understood that Buyer shall pay the Cure Costs (and the Purchase Price will be reduced by the amount of such Cure Costs as a result of the Post-Closing Adjustment) and provide adequate assurance of future performance to the extent required by section 365 of the Bankruptcy Code.

(b)      To the extent that any Contract or Lease to be sold, transferred, conveyed or assigned (any sale, transfer, conveyance or assignment, a "**Transfer**") to Buyer pursuant to the terms hereof is not capable of being Transferred to Buyer (after giving effect to the Sale Order) without the Consent of a third Person (each such Contract or Lease, a "**Consent Pending Contract**"), or if such Transfer or attempted Transfer would, or if the subsequent Transfer or attempted Transfer of the equity interests of Buyer would, constitute a breach thereof or a violation of any Law, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a Transfer or an attempted Transfer thereof prior to the

time at which all Consents necessary for such Transfer will have been obtained unless an Order of the Bankruptcy Court effects such Transfer without Consent, Buyer may elect in its sole and absolute discretion, exercisable until the earlier of the date the Sale Order is entered or ten (10) Business Days prior to the Closing, to (i) exclude such Consent Pending Contract from the Assigned Contracts and Purchased Assets, or (ii) if the failure to effect a Transfer of any Consent Pending Contract listed on **Section 2.05(b)** of the Disclosure Schedules, terminate this Agreement as provided in **Article IX**.

    (c)    Seller shall not reject (or move to reject) under section 365 of the Bankruptcy Code any Contract or Lease until after the Closing Date or the termination of this Agreement pursuant to **Article IX**. Notwithstanding anything in this Agreement to the contrary, on the date any Contract or Lease is assumed and assigned to Buyer, such Contract or Lease shall be deemed an Assigned Contract.

    **Section 2.06**    **Purchase Price.**  The aggregate purchase price for the Purchased Assets shall be $16,500,000 in cash (the "**Cash Consideration**"), subject to adjustment pursuant to **Section 2.07** hereof (the "**Purchase Price**"), plus the assumption of the Assumed Liabilities.  The Cash Consideration shall be paid as follows:

    (a)    **Purchase Price Deposit.**  Upon execution and delivery of this Agreement, Buyer shall deliver a deposit in the amount of $1,000,000 (the "**Deposit**") in immediately available funds to Tydings & Rosenberg LLP (the "**Deposit Agent**"), as escrow agent under an escrow agreement by and among Seller, Buyer and Deposit Agent (the "**Deposit Escrow Agreement**").  At Closing, the Deposit Agent shall deliver the Deposit to Seller, which shall be applied dollar-for-dollar toward payment of the Purchase Price.  The deposit shall be refundable if this Agreement is terminated pursuant to **Section 9.01(a), Section 9.01(b), Section 9.01(c), or Section 9.01(d)(ii)**; otherwise, the Deposit shall be nonrefundable.

    (b)    On the Closing Date, the Cash Consideration, less the Deposit, the Escrow Amount and the Repair Escrow Amount, shall be paid by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer no later than two Business Days prior to the Closing Date.

    (c)    On the Closing Date, the Escrow Amount shall be deposited by wire transfer of immediately available funds into an account designated by the Escrow Agent and shall be held and distributed in accordance with the terms of the Escrow Agreement to satisfy (i) any adjustments to the Purchase Price in favor of Buyer pursuant to **Section 2.07**; and (ii) any and all claims made by Buyer or any other Buyer Indemnitee against Seller pursuant to **Section 7.06**.

    (d)    On the Closing Date, the Repair Escrow Amount shall be deposited by wire transfer of immediately available funds into an account designated by the Deposit Agent, as escrow agent under the Repair Escrow Agreement, and shall be held and distributed in accordance with the terms of the Repair Escrow Agreement to satisfy the costs of the Repairs and Replacements.

    **Section 2.07**    **Purchase Price Adjustment.**

    (a)    **Post-Closing Adjustment.**

    (i)    Within 30 days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth its calculation of Closing Net Asset, which statement shall be substantially in the form of **Section 2.07(a)(i)** of the Disclosure Schedules and prepared in accordance with GAAP and, to the extent that options exist under those principles, using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Interim Balance Sheet (the "**Closing Net Asset Statement**").  The Closing Net Asset Statement shall include all Cure Costs calculated as of the Closing Date.

    (ii)    The "**Post-Closing Adjustment**" shall be an amount equal to the Closing Net Asset minus $10,243,931.  If the Post-Closing Adjustment is a positive number, Buyer shall pay to Seller an amount equal to the Post-Closing Adjustment.  If the Post-Closing Adjustment is a negative number, Seller shall pay to Buyer an amount equal to the Post-Closing Adjustment, provided that any Post-Closing Adjustment requiring Seller to pay Buyer shall be limited to the Escrow Amount then held by the Escrow Agent.

    (b)    **Examination and Review.**

(i)    After receipt of the Closing Net Asset Statement, Seller shall have 15 Business Days (the "**Review Period**") to review the Closing Net Asset Statement. During the Review Period, Buyer shall cooperate and assist Seller, free of charge to Seller, in its review of the Closing Net Asset Statement and Seller's accountants shall have full access to the relevant books and records of Buyer, the personnel of, and work papers prepared by, Buyer and/or Buyer's accountants to the extent that they relate to the Closing Net Asset Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Net Asset Statement as Seller may reasonably request for the purpose of reviewing the Closing Net Asset Statement and to prepare a Statement of Objections (defined below), *provided, that* such access shall be in a manner that does not interfere with the normal business operations of Buyer.

(ii)    On or prior to the last day of the Review Period, Seller may object to the Closing Net Asset Statement by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item, disputed amount and the basis for Seller's disagreement therewith (the "**Statement of Objections**"). If Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Net Asset Statement and the Post-Closing Adjustment, as the case may be, reflected in the Closing Net Asset Statement shall be deemed to have been accepted by Seller. If Seller delivers the Statement of Objections before the expiration of the Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within 15 days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Closing Net Asset Statement with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding.

(iii)    If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**" and any amounts not so disputed, the "**Undisputed Amounts**") shall be submitted for resolution to the office of an impartial nationally recognized firm of independent certified public accountants appointed by mutual agreement (the "**Independent Accountants**") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Net Asset Statement. The Independent Accountants shall only decide the specific items under dispute by the Parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Net Asset Statement and the Statement of Objections, respectively.

(iv)    Seller and Buyer shall bear the fees and expenses of the Independent Accountants in equal portions.

(v)    The Independent Accountants shall make a determination as soon as practicable within thirty (30) days (or such other time as the Parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Net Asset Statement and/or the Post-Closing Adjustment shall be conclusive and binding upon the Parties hereto.

(vi)    Except as otherwise provided herein, any payment of the Post-Closing Adjustment shall (A) be due (x) within five (5) Business Days of acceptance of the applicable Closing Net Asset Statement or (y) if there are Disputed Amounts, then within five (5) Business Days of the resolution described in clause (v) above; and (B) be paid by wire transfer of immediately available funds to such account as is directed by Buyer or Seller, as the case may be. Any payment of the Post-Closing Adjustment owed by Seller to Buyer shall be paid by the Escrow Agent from the Escrow Amount pursuant to the terms of the Escrow Agreement. The amount of any Post-Closing Adjustment shall bear no interest from the Closing Date to the date of payment.

(c)    **Adjustments for Tax Purposes.** Any payments made pursuant to **Section 2.07** shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

**Section 2.08    Allocation of Purchase Price.** Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all

purposes (including Tax and financial accounting) as shown on the allocation schedule (the "**Allocation Schedule**"). Buyer shall make commercially reasonable effort to prepare a draft of the Allocation Schedule in a manner consistent with Sections 338 and 1060 of the Code and the regulations thereunder, and deliver it to Seller within 30 days following the final determination of the Post-Closing Adjustment; *provided, however,* that Buyer may extend the time period within which to deliver such draft for another 15 days upon reasonable request of Buyer's accountants. If Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule within 10 days after the delivery thereof, Seller and Buyer shall negotiate in good faith to resolve such dispute; *provided, however,* that if Seller and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within 45 days following the objection, such dispute shall be resolved by the Independent Accountants. The fees and expenses of such accounting firm shall be borne equally by Seller and Buyer. Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule.

# ARTICLE III
# CLOSING

**Section 3.01     Closing.** Subject to the terms and conditions of this Agreement (including Sections 9.01(c)(iii) and 9.01(d)(ii)), the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Tydings & Rosenberg LLP, 100 East Pratt Street, Baltimore, Maryland, 21202, at 11:00 a.m., Eastern Standard Time, on the second Business Day after all of the conditions to Closing set forth in **Article VIII** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 3.02     Closing Deliverables.**

(a)     At the Closing, Seller shall deliver to Buyer the following:

(i)     the Escrow Agreement duly executed by Seller;

(ii)     a bill of sale substantially in the form of **Exhibit C** attached hereto and in form and substance reasonably satisfactory to Buyer (the "**Bill of Sale**") and duly executed by Seller, transferring the Tangible Personal Property to Buyer;

(iii)     instruments of assignments for any Patents, Trademarks, Copyrights or Domain Names that are owned by Seller, transferrable and assignable by Seller and included in the Purchased Assets, duly executed by Seller in form for recordation with the appropriate Governmental Authorities, in form and substance satisfactory to Buyer, and any other assignments or instruments required to assign, transfer and convey to Buyer any and all right, title and interest of Seller in other Intellectual Property, to the extent such Intellectual Property is owned by Seller, transferable and assignable by Seller, and included in the Purchased Assets; and

(iv)     such other instruments and documents as may reasonably be required to give effect to this Agreement and the Sale Order.

(b)     At the Closing, Buyer shall deliver to Seller the following:

(i)     the Cash Consideration, less the Deposit and the Escrow Amount; and

(ii)     such other instruments and documents as may reasonably be required to give effect to this Agreement and the Sale Order.

(c)     At Closing, pursuant to section 365 of the Bankruptcy Code and the Sale Order, Seller shall assume and assign to Buyer, and Buyer shall consent to such assignment from Seller of, all of the Assigned Contracts (including the Leases).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller hereby represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the date hereof and as of the Closing Date.

**Section 4.01      Organization and Qualification of Seller.**  Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Maryland and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted.  **Section 4.01** of the Disclosure Schedules sets forth each jurisdiction in which Seller is licensed or qualified to do business, and Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except where the failure to so qualify of be licensed or in good standing would not have or be a Material Adverse Effect.

**Section 4.02      Authorization and Validity.**  Subject to the Bidding Procedures Order and the Sale Order, Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to the Bidding Procedures Order and the Sale Order, the execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by each other party thereto) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by the Bidding Procedures Order, the Sale Order and bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally or by general equitable principles.   When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by the Bidding Procedures Order, the Sale Order and bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally or by general equitable principles.

**Section 4.03      No Conflicts; Consents.**  To Seller's Knowledge, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) except as provided in the Sale Order, conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Seller; (b) conflict with or result in a violation or breach in any material respect of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) other than the Sale Order, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Assigned Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) except as provided in the Sale Order, result in the creation or imposition of any Encumbrance on the Purchased Assets (other than a Permitted Encumbrance).  Other than the Sale Order, to Seller's Knowledge, no other consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 4.04    Financial Statements.** Complete copies of the unaudited financial statements consisting of the balance sheet of the Business as at December 31, 2013 and the related statements of income and retained earnings, stockholders' equity and cash flow for the year then ended (the "**Financial Statements**") have been delivered to Buyer. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved. The Financial Statements are based on the books and records of the Business, and, to the actual knowledge of any Joseph Wolfson and Charles Deutchman, after due inquiry, fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

**Section 4.05    Title to Purchased Assets.** Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets, subject to Permitted Encumbrances.

## ARTICLE V
## REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGMENTS OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the date hereof and as of the Closing Date.

**Section 5.01    Organization of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of Japan.

**Section 5.02    Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally or by general equitable principles. When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally or by general equitable principles.

**Section 5.03    No Conflicts; Consents.** Subject to the Sale Order, the execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05      Legal Proceedings.**  There are no Actions pending or threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**Section 5.06      Buyer Broker Fees.**  Neither Buyer nor any of its Representatives has paid or become obligated to pay any fee, commission or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which any Seller is or will become liable, and Buyer shall indemnify and hold harmless Seller from any claims with respect to any such fees, commissions or similar payments.

**Section 5.07      No Known Breach by Seller.**  Buyer is not aware of any facts or circumstance, which (with or without notice or lapse of time or both) would cause any representations or warranties of Seller to be untrue or incorrect in any respect.

**Section 5.08      Acknowledgement Purchased Assets Acquired "AS IS".**  Buyer agrees, warrants, and represents that, except as set forth in this Agreement, (a) Buyer is purchasing the Purchased Assets on an "AS IS" basis and "WITH ALL FAULTS" based solely on Buyer's own investigation of the Purchased Assets and (b) neither Seller nor its Representatives has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets or the Assumed Liabilities, any part of the Purchased Assets or the Assumed Liabilities, relating to the financial performance of the Purchased Assets or the Business, or the physical condition of the Purchased Assets.  Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Assets "AS IS" and "WITH ALL FAULTS".  Buyer confirms that Seller has made available to Buyer the opportunity to ask questions of the officers and management of Seller and to acquire additional information about the Business, the Purchased Assets and the Assumed Liabilities.  Buyer agrees, warrants, and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon Buyer's own investigation of all such matters, and that Buyer assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER MAKES NO EXPRESS WARRANTY, WARRANTY OF MERCHANTABILITY, WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS.

**Section 5.09      Availability of Funds.**  Buyer has as of the date hereof, and will have on the Closing Date, sufficient cash on hand or other sources of immediately available funds to enable Buyer to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 5.10      No Other Representations or Warranties of Seller.**

(a)      Except for the representations and warranties contained in **Article IV**, Buyer acknowledges that neither Seller nor its Representatives makes any other express or implied representation or warranty with respect to Seller or the Business (including representations and warranties as to the condition of the Purchased Assets).  No Seller nor any other Person will have or be subject to any liability or indemnification obligation to Buyer or any other Person resulting from the distribution to Buyer, or use by Buyer of, any such information, including any information, documents, projections, forecasts or other material made available to Buyer in certain "data rooms", confidential information memoranda or management presentations in expectation of the transactions contemplated by this Agreement.

(b)      In connection with investigation by Buyer, Buyer has received or may receive from Seller certain projections, forward-looking statements and other forecasts and certain business plan information.  Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that, except for the representations and warranties contained in **Article IV**

18

and subject to the terms and conditions hereof, Buyer shall have no claim against anyone with respect thereto. Accordingly, except for the representations and warranties contained in **Article IV**, Buyer acknowledges that Seller does not make and has not made any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

# ARTICLE VI
## ACTIONS PRIOR TO CLOSING DATE

**Section 6.01**        **Investigation of the Business By Buyer**.

(a)        From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Seller may be bound, upon reasonable notice, Seller shall afford Buyer's authorized Representatives reasonable access during normal business hours to the offices, properties, key employees, outside accountants, agreements and other documentation and financial and Tax records (including computer files, retrieval programs and similar documentation) with respect to the Business, the Purchased Assets and the Assumed Liabilities to the extent Buyer reasonably deems necessary, and shall permit Buyer and its authorized Representatives to make copies of such materials at Buyer's sole expense. From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Seller may be bound, Seller shall furnish to Buyer or its authorized Representatives such additional information concerning the Purchased Assets, the Business and the Assumed Liabilities as shall be reasonably requested by Buyer or its authorized Representatives, including all such information as shall be reasonably necessary to enable Buyer or its authorized Representatives to (i) verify the accuracy of Seller's representations and warranties contained in this Agreement, (ii) verify that Seller has complied with the covenants contained in this Agreement, (iii) determine whether the conditions set forth in **Article VIII** have been satisfied and (iv) estimate the Closing Net Asset. From and after the date hereof until the Closing, Seller shall promptly furnish to Buyer a monthly financial statements of Seller within five Business Days after the end of each calendar month and the estimated Closing Net Asset Statement no later than ten Business Days prior to the Closing Date. From and after the date hereof until the Closing, Seller shall use its commercially reasonable efforts to cause its outside accountants and outside counsel to cooperate with Buyer in such investigation. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Seller in this Agreement. Notwithstanding anything to the contrary herein, no such investigation or examination shall be permitted, and no such documents or information shall be required to be provided or made available, to the extent that it would require Seller to disclose documents or information subject to attorney-client privilege. For the avoidance of doubt, nothing in this **Section 6.01** is intended to create a due diligence contingency in favor of Buyer.

(b)        From and after the date hereof until the Closing, as reasonably requested by Buyer from time to time, Seller shall use commercially reasonable efforts to cooperate with Buyer in connection with arranging such meetings or telephone conferences with material suppliers and customers of the Business as may be necessary and appropriate for Buyer to conduct a comprehensive review of Seller's relations with its customers and suppliers.

**Section 6.02**        **Operations Prior to the Closing Date.** From the date hereof until the Closing, Seller shall use commercially reasonable efforts to (x) maintain the Purchased Assets and operate and carry on the Business only in the Ordinary Course of Business, taking into account Seller's status as a debtor in possession and subject to the availability of funding therefor, and except as otherwise expressly provided in this Agreement or in any orders of the Bankruptcy Court; and (y) maintain the business organization of the Business intact and to preserve the goodwill of the manufacturers, suppliers, contractors, licensors, employees, customers, distributors and others having business relations with the Business. In connection therewith, between the date hereof and the Closing, Seller shall not (i) offer employment for any period on or after the Closing Date to any employee or agent of the Business regarding whom Buyer makes offers of employment in accordance with the terms set forth herein, (ii) otherwise attempt to persuade any such employee or agent to

terminate his or her relationship with the Business, (iii) materially alter the terms of employment of any employee or agent of the Business, (iv) collect or settle Accounts Receivable, sell Inventory, or grant customer refunds, rebates, returns, or discounts other than in the Ordinary Course of Business, (v) incur new liabilities in excess of $500,000, or (vi) enter into or renew contracts for a period longer than one year.

**Section 6.03    Third Party Consents.** Subject to **Section 2.05**, from the date hereof until the Closing, Seller, on the one hand, and Buyer, on the other hand, will reasonably cooperate with the other to secure, before the Closing Date, all third party consents to the extent such consents are not provided for, or the need for which is not obviated or satisfied, by the Sale Order, *provided* that, subject to **Section 2.05**, neither Seller nor Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers (in the case of Seller, unless Buyer requests that Seller make such a payment or provide such other consideration and Buyer agrees to pay Seller or provide such other consideration in advance for such payment and any associated costs); *provided, however*, that neither Buyer nor Seller shall be required to waive any of the conditions to Closing set forth in **Article VIII**.

**Section 6.04    Governmental Approvals.**

(a)    From and after the date hereof until the Closing Date, Seller and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable Law to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Authority required to be obtained by them under non-United States antitrust or competition laws, in order to assign or transfer any Permits to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in **Article VIII**, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order; *provided, however*, that neither Seller nor Buyer shall make any agreement or understanding affecting the Purchased Assets or the Business (excluding the Excluded Assets or Excluded Liabilities) as a condition for obtaining any such consents or approvals except with the prior written consent of the other (which consent shall not be unreasonably withheld or delayed). Seller and Buyer shall act diligently and reasonably to cooperate with the other, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this **Section 6.04(a)**; *provided, however*, neither Seller nor Buyer shall be required to waive any of the conditions to Closing set forth in **Article VIII**.

(b)    Seller and Buyer: (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval; and (ii) shall permit each other to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, neither Seller nor Buyer shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, without consulting with each other in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each of Seller and Buyer shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Seller and Buyer shall also furnish each other with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with its preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Seller and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof by a Governmental Order as soon as possible.

**Section 6.05      Non-competition.**  For a period of five (5) years commencing on the Closing Date, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business, or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

**Section 6.06      Notice of Developments.**  From the date hereof until the Closing, Seller shall promptly notify Buyer of, to Seller's Knowledge, (a) any change or development which would cause any of the representations and warranties in **Article IV** not to be true and correct in all material respects, or (b) any material failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by Seller under this Agreement.

# ARTICLE VII
# ADDITIONAL AGREEMENTS

**Section 7.01      Taxes.**

(a)      Except as specifically set forth herein (including **Section 7.01(a)**), Seller shall be liable for and shall pay, and pursuant to **Section 7.01(c)** shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Purchased Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date. Without limiting the obligations of Buyer contained elsewhere in this Agreement (including **Section 7.01(a)**), Buyer shall be liable for and shall pay, and pursuant to **Section 7.01(c)** shall reimburse Seller for, all Taxes (whether assessed or unassessed) applicable to the Business, the Purchased Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date. For purposes of this **Section 7.01(a)**, any period beginning before and ending after the Closing Date shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)      Without limiting the other terms set forth in this Agreement, all Transfer Taxes shall be borne and paid by Seller as and when due. Seller shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; *provided, however*, that in the event any such Tax Return requires execution by Buyer, Seller shall prepare and deliver to Buyer a copy of such Tax Return at least ten days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Seller, which shall cause it to be filed.

(c)      Seller or Buyer, as the case may be, shall provide reimbursement for any Taxes, all or a portion of which is the responsibility of such Party, paid by the other Party in accordance with the terms of this **Section 7.01**. Within a reasonable time prior to the payment of any such Taxes, the Party paying such Taxes shall give notice to the other of the Taxes payable and each Party's respective liability therefor, although failure to do so will not relieve the other Party from its liability hereunder.

**Section 7.02      Collections after Closing.**  If, after the Closing Date, Seller receives payment from any account debtor with respect to any Assigned Contract, within ten (10) Business Days after Seller's receipt thereof, Seller shall deliver all such funds and/or assets to Buyer and take all steps necessary to effectuate the transfer of such funds and/or assets to Buyer. From and after the Closing, if Buyer receives or collects any funds relating to any Excluded Asset, within ten (10) Business Days after Buyer's receipt thereof,

Buyer shall deliver all such funds and/or assets to Seller and take all steps necessary to effectuate the transfer of such funds and/or assets to Seller.

**Section 7.03      Employee Matters.**

(a)      Commencing on the Closing Date, Seller shall terminate all employees of the Business who are actively at work on the Closing Date and accept Buyer's offer of employment and commence working for Buyer on the Closing Date ("**Transferred Employees**"). Prior to the Closing, and except with respect to those employees listed in **Section 7.03(a)** of the Disclosure Schedules, which schedule shall not be subject to amendment or modification hereafter without the express written consent of Buyer, Buyer shall offer employment, on an "at-will" basis, to each of Seller's employees who remain employed by Seller immediately prior to the Closing and Seller's termination of such employees as provided above (the "**Eligible Employees**"), and all such offers of employment shall be at substantially the same annual rate of pay at which such employees were employed as of the Effective Date. For purposes of determining whether the rate of pay offered by Buyer is substantially similar, the Benefit Plan shall be disregarded. So long as offers of employment have been mailed or e-mailed by Buyer to all Eligible Employees prior to Closing, then Buyer shall be deemed to have satisfied its obligation to offer employment to the Eligible Employees prior to Closing. Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, salary, wages, bonus, commissions, vacation, severance and other employee payroll obligations (including accrued payroll Taxes), expenses and ordinary course benefits owing to Seller's employees as of the Closing Date (or that become owing to such employees upon the termination of their employment including all Liability arising under the WARN Act).

(b)      Buyer will cause any employee benefit plans of Buyer (or any Affiliate thereof sponsoring or maintaining such plans) which the Transferred Employees are entitled to participate in from and after the Closing Date (the "**Buyer Plans**") to take into account for purposes of eligibility and vesting thereunder, service by the Transferred Employees with Seller prior to the Closing as if such service were with Buyer, to the same extent such service was credited under a comparable Benefit Plan of Seller prior to the Closing (except to the extent it would result in the duplication of benefits). In addition, with respect to each Buyer Plan that is a "welfare benefit plan" (as defined in Section 3(1) of ERISA), Buyer shall, or shall cause an Affiliate of Buyer sponsoring or maintaining such Buyer Plan, to (i) cause there to be waived any pre-existing condition, exclusions, actively at work requirements, unsuitability requirements or other eligibility limitations and (ii) give effect, in determining any deductible, co-insurance and maximum out-of-pocket limitations, to claims incurred and amounts paid by, and amounts reimbursed to, the Transferred Employees and their dependents under a comparable Benefit Plan of Seller prior to the Closing.

(c)      With respect to Transferred Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53m 2004-34 I.R.B. 320, for purposes of employment tax reporting.

(d)      Other than as expressly set forth in this Agreement, nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require any minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

**Section 7.04      Post-Closing Cooperation and Access to Books and Records.** For a period ending on the later of one (1) year after the closing of the Bankruptcy Case (or such longer period as may be required by any Governmental Authority or ongoing claim):

(a)      Buyer shall not dispose of or destroy any of the business records and files of the Business held by Buyer or any of its Affiliates or Representatives and relating to the period preceding the Closing Date.

(b)      Each Party (the "**Requested Party**") shall allow any other Party (including, for clarity, any trust established under a chapter 11 plan of Seller or any other successors of Seller) and any of their directors, officers, employees, counsel, representatives, accountants and auditors, at such other Party's sole cost and

expense but otherwise free of charge to such other Party, reasonable access during normal business hours (which shall include an office at the Baltimore Facility for Seller, its Representatives or any successor or designated bankruptcy estate representative), and upon reasonable advance notice, to all employees (including the assistance of such employees as described below) and files (including Tax related files) of the Requested Party and any books and records and other materials included in the Purchased Assets relating to periods prior to the Closing Date; *provided, however*, that Seller and Buyer will be required to sign a non-disclosure agreement, if reasonably requested by Buyer or Seller or any successor or designated bankruptcy estate representative, respectively, prior to Buyer or Seller or any successor or designated bankruptcy estate representative's provision of information to Seller or any successor or designated bankruptcy estate representative or Buyer, respectively, that constitutes a trade secret, or is otherwise confidential or proprietary in nature.

Section 7.05    **Post-Closing Tax Returns.**  Buyer hereby covenants that it will reasonably cooperate and assist Seller in the preparation and filing of all necessary Tax Returns of Seller that are required to be filed following the Closing Date; *provided, however* that any costs and expenses with respect to the preparation and filing of any such Seller Tax Returns shall be borne by Seller; *provided, further, however*, that, except as expressly set forth in this Agreement, Buyer shall have no liability with respect to Taxes payable in connection with such Seller Tax Returns, and Buyer shall have no liability with respect to such Seller Tax Returns other than in connection with the willful or intentional misconduct of Buyer.

Section 7.06    **Indemnification By Seller.**  Only to the extent of the Escrow Amount held by the Escrow Agent, Seller shall indemnify and defend Buyer and its Affiliates and their Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all damages and losses (including, fines, penalties, cost and expenses, including reasonable attorneys' fees) incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date; (b) any breach of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement; (c) any Excluded Asset or any Excluded Liability; or (d) any third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Seller or any of its Affiliates (other than the Purchased Assets or Assumed Liabilities) conducted, existing or arising on or prior to the Closing Date.

Section 7.07    **Indemnification By Buyer.**  Buyer shall indemnify and defend Seller and its Affiliates and their Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all damages and losses (including, fines, penalties, cost and expenses, including reasonable attorneys' fees) incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date; (b) any breach of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement; (c) any Purchased Asset or any Assumed Liability; or (d) any third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Buyer or any of its Affiliates (other than the Excluded Assets or Excluded Liabilities) conducted, existing or arising after the Closing Date.

Section 7.08    **Limitations to Indemnification.**  Seller's maximum liability to the Buyer Indemnitees for indemnification under **Section 7.06**, and Buyer's maximum liability to the Seller Indemnitees for indemnification under **Section 7.07**, shall not exceed the Escrow Amount then held by the Escrow Agent.

Seller shall not be liable to the Buyer Indemnitees for indemnification under **Section 7.06(a)** and **Section 7.06(b)** until the aggregate amount of all losses in respect of indemnification under such sections exceeds $30,000, in which event Seller shall be required to pay or be liable for all such losses from the first dollar but shall not exceed the Escrow Amount then held by the Escrow Agent.

      **Section 7.09      Indemnification Procedure.**  Whenever any claim shall arise for indemnification hereunder, the Party entitled to indemnification (the **"Indemnified Party"**) shall promptly provide written notice of such claim to the other Party (the **"Indemnifying Party"**).  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party.  The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom.  The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

      **Section 7.10      Tax Treatment of Indemnification Payments.**  All indemnification payments made under this Agreement shall be treated by the Parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

      **Section 7.11      Certain Agreements on Repairs and Replacements.**  For clarification and for the avoidance of doubt, Buyer shall have no liability for making the permanent electrical connection to the main production plant damaged as a result of the Fire or for paying the costs of such repairs and/or replacements after the Closing Date.  The Repair Escrow Amount to be deposited in the separate account held by the Deposit Agent (the **"Repair Escrow"**) is specifically earmarked to cover the estimated costs of the repairs and replacements to restore the permanent electrical connection to the main production plant in compliance with applicable electrical and other building codes (but excluding the cost of repair and replacement incurred by Seller on or before the Closing Date) (the **"Repairs and Replacements"**).  Seller shall have no liability with respect to the Repairs and Replacements except to the extent of funds held in the Repair Escrow; provided, however, that Seller shall continue to use those funds it may receive from its insurer that are intended for payment of Repairs and Replacements for such purposes.  All funds deposited into the Repair Escrow shall be exclusively for the payment of the costs for the Repairs and Replacements and for no other purpose, and the Repair Escrow shall in all respects be created, established and maintained to effectuate this result.  Buyer shall have no claim against Seller or the Repair Escrow if the actual costs for the Repairs and Replacement exceed the amount of the Repair Escrow.  To the extent that Seller's insurer satisfies the cost of Repairs and Replacements, then Seller shall be entitled to receive (on a dollar-for-dollar basis) funds from the Repair Escrow equal to such payments from Seller's insurer.  If, after completion of all Repairs and Replacements and satisfaction of the costs associated therewith, there are any sums remaining in the Repair Escrow, such sums shall be paid over to Seller.  In addition, notwithstanding the foregoing, any and all funds remaining in the Repair Escrow after 9 months from the Closing Date shall be released to Seller.

      **Section 7.12      Waiver of Bulk Sales Act.**  Buyer hereby waives compliance with the provisions of any Bulk transfer laws.

      **Section 7.13      Further Assurances.** Following the Closing, Seller and Buyer shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

# ARTICLE VIII
## CONDITIONS TO CLOSING

**Section 8.01**        **Bankruptcy Conditions.**  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of the following conditions:

(a)        Approval of Break-Up Fee and Expense Reimbursement. Seller acknowledges and agrees that Buyer has expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller.  In consideration therefor,

(i)        Seller shall file the Bidding Procedures Motion with the Bankruptcy Court, and seek the entry by the Bankruptcy Court of the Bidding Procedures Order, including the approval of the payment of a break-up fee in an amount equal to $600,000 (the "**Break-Up Fee**") and an expense reimbursement in an amount not to exceed $250,000 (the "**Expense Reimbursement**") for Buyer's reasonable and documented out-of-pocket expenses incurred in connection with the transaction contemplated hereby;

(ii)        The Bidding Procedures Order shall provide that the Break-Up Fee and the Expense Reimbursement shall be paid to Buyer from the proceeds (the "**Alternative Transaction Proceeds**") of sale on the closing of an Alternative Transaction approved by Bankruptcy Court and prior to any other distributions to creditors (or otherwise) from the Alternative Transaction Proceeds; and

(iii)        The Bidding Procedures Order shall also provide that no further or additional order from the Bankruptcy Court shall be required in order to give effect to these provisions relating to the terms of payment of the Break-Up Fee and the Expense Reimbursement.

(b)        Approval of Bidding Procedures. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, an "**Alternative Transaction**"). Prior to seeking approval of the sale of the Purchased Assets, Seller shall seek the Bankruptcy Court's approval of the Bidding Procedures Order, which shall include the following procedures and overbid protections for the submission and consideration of qualified bids, along with such other bidding procedures consistent herewith as determined by Seller to be appropriate:

(i)        In order for any Alternative Transaction to be a qualified bid (each, a "**Qualified Bid**"), it must be:

(A)        in writing;

(B)        received by Seller and Buyer at their respective addresses set forth in **Section 10.04** no later than the deadline for submitting an Alternative Transaction established by the Bidding Procedures Order (the "**Bid Deadline**");

(C)        a firm, unconditional bid to purchase the Purchased Assets, not subject to any contingencies as to the validity, effectiveness and/or binding nature of the offer, including, without limitation, further due diligence review or financing;

(D)        a firm bid of at least $100,000 in excess of the Cash Consideration (in addition to assumption of the Assumed Liabilities) plus the Break-Up Fee plus the Expense Reimbursement;

(E)        accompanied by sufficient information to demonstrate that the competing bidder has the financial wherewithal and ability to timely consummate the acquisition of the Purchased Assets on terms and conditions substantially the same as this Agreement, including evidence of adequate financing and a financial guaranty, if appropriate;

(F)        accompanied by a signed contract substantially in the form of this Agreement, and marked to show any changes made to this Agreement; and

(G)    accompanied by a good faith cash deposit in an amount equal to the Deposit plus the Break-Up Fee plus the Expense Reimbursement, to be deposited with Seller (or an escrow agent) on or before the Bid Deadline.

(ii)    Seller shall promptly inform Buyer of all Qualified Bids and any information received related to the terms and conditions of such Qualified Bids;

(iii)    Buyer shall have the opportunity to increase its offer to a level at least $100,000 in excess of any Qualified Bid to be eligible to become the starting bid at the auction (the "**Auction**") contemplated by the Bidding Procedures Order (the "**Starting Auction Bid**"); and, in connection therewith, Buyer shall be entitled to credit bid its Break-Up Fee and Expense Reimbursement against the purchase price reflected in such Qualified Bid;

(iv)    Seller shall evaluate all Qualified Bids received and shall determine which Qualified Bid reflects the highest or best offer as the Starting Auction Bid for the Purchased Assets. Seller shall announce its determination of the Starting Auction Bid at the commencement of the Auction;

(v)    The first incremental competitive bid at the Auction shall be at least $100,000 in excess of the Starting Auction Bid, with any subsequent increases of bids to be made in increments of at least $100,000;

(vi)    No bids shall be considered by Seller unless a party submitted a Qualified Bid and participates in the Auction;

(vii)    All of the Purchased Assets shall be sold in a single lot;

(viii)    If Seller desires to select a bid from an entity other than Buyer that Buyer believes is not the highest or best bid, the Bankruptcy Court shall determine which is the successful bidder;

(ix)    When determining the highest or best bid, Seller shall include the Break-Up Fee and the Expense Reimbursement in Buyer's last bid, which Break-Up Fee and Expense Reimbursement would otherwise be payable to Buyer;

(x)    If any overbid from an entity other than Buyer is accepted but fails to be consummated, Seller shall be obligated to consummate the transaction with Buyer, at Buyer's option, on the terms of this Agreement, except for the purchase price, which shall equal the purchase price of the next highest bid that was submitted to Seller during the Auction; and

(xi)    In the event that Seller determines in good faith that it has not received a Qualified Bid by the Bid Deadline that is a higher or better bid than the one represented by this Agreement, Seller shall seek approval of this Agreement at the Sale Hearing without conducting an Auction and without further motion.

(c)    Solicitation. Until the transaction contemplated by this Agreement and approved by the Sale is consummated, Seller and its Representatives are permitted to initiate or continue contact with, solicit, or encourage submission of bids, inquiries, offers and proposals by, any Person other than Buyer in connection with any sale or other disposition of the Purchased Assets. In addition, Seller may respond to all inquiries, bids, offers and proposals from any such Person for all or part of the Purchased Assets and shall perform any and all acts related thereto required under the Bankruptcy Code or other applicable law, including, without limitation, providing information relating to the Business and the assets of Seller to other prospective purchasers.

(d)    Entry of Sale Order. Within sixty (60) days after the Petition Date, unless extended by agreement of Seller and Buyer, the Bankruptcy Court shall have entered a final order (the "**Sale Order**"), substantially in the form of **Exhibit D** attached hereto, which among other things, pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

(i)    approves this Agreement and authorizes the sale of the Purchased Assets by Seller to Buyer on the terms set forth herein;

(ii)     provides that the sale of the Purchased Assets vests Buyer with all right, title and interest of Seller in, to and under the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances, if any), and on an "AS IS" and "WHERE IS" basis, without any representations or warranties of any kind (including no representations or warranties as to merchantability, fitness or use) other than those specifically set forth in this Agreement;

(iii)     finds that Buyer has provided adequate assurance of future performance under the Assigned Contracts and otherwise approves the assumption of the Assigned Contracts and assignment to Buyer;

(iv)     establishes the amount of the Cure Costs to be paid in accordance with this Agreement;

(v)     finds that Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and is entitled to the protections thereof;

(vi)     finds that the sale of the Purchased Assets to Buyer pursuant to the terms of this Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the states in which Seller is incorporated and any other applicable non-bankruptcy laws;

(vii)     enjoins all Persons from taking any actions against Buyer or its affiliates to recover any claim which such Person has solely against Seller;

(viii)     finds that Seller has released all Avoidance Claims (including Actions relating thereto) against (a) any counter party to an Assigned Contract and (b) any supplier who has received from Seller aggregate consideration greater than or equal to $400,000 for each of the two most recent fiscal years;

(ix)     provides that the obligations of Seller relating to Taxes, whether arising under law, by this Agreement, or otherwise, shall be fulfilled by Seller;

(x)     provides that the provisions of the Sale Order are non-severable and mutually dependent;

(xi)     provides that Buyer will not have any successor or transferee liability for liabilities of Seller (whether under federal or state law or otherwise) as a result of the sale of the Purchased Assets and assumption of the Assumed Liabilities; and

(xii)     authorizes Seller to execute such other documents and instruments and take such other actions as may be reasonably necessary or appropriate to allow the consummation of the transactions contemplated hereby.

(e)     <u>Bankruptcy Court Approval</u>.

(i)     Seller shall file with the Bankruptcy Court, within three (3) days after the Petition Date, the Bidding Procedures Motion and the Sale Motion (each in a form satisfactory to Buyer, and which may be a single motion). Such motion(s) shall request, among other things, (i) the scheduling of the Auction to commence no later than fifty-five (55) days after the Petition Date, with the Sale Hearing to be held immediately after completion of the Auction and in any event no later than sixty (60) days after the Petition Date, and (ii) entry of the Bidding Procedures Order and Sale Order in all material respects on the terms set forth herein. At least 15 days prior to the Sale Hearing, Seller shall serve a copy of the Sale Motion (along with a copy of the proposed Sale Order and the Bidding Procedures Order) on each jurisdiction where the Purchased Assets are subject to Tax.

(ii)     Seller shall cooperate with Buyer and its Representatives in connection with the Sale Order, the Bidding Procedures Order, and the bankruptcy proceedings in connection therewith. Such cooperation shall include consulting with Buyer at Buyer's reasonable request concerning the status of such proceedings and providing Buyer with copies of pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. Seller further covenants and agrees that the terms of any plan it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms this Agreement, or in any way prevent or interfere with the consummation or performance of the transaction contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Bidding Procedures Order or the Sale Order.

(iii)    In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such Orders.

(iv)    Buyer acknowledges that it is Buyer's obligation to provide adequate assurance of future performance of the Assigned Contracts (including the Leases) to the extent necessary under section 365 of the Bankruptcy Code and, notwithstanding anything to the contrary herein, that Seller shall not be obligated to assume and assign any Assigned Contract (including any Lease) with respect to which Buyer fails to satisfy the applicable counter party or the Bankruptcy Court as to adequate assurance of future performance (collectively, if any, the "**Non-Assured Contracts**") and Buyer's obligation to close the transactions contemplated herein shall not be conditioned upon the transfer and assignment to Buyer of any such Non-Assured Contracts.

(v)    Seller and Buyer shall cooperate in taking such other reasonable actions as necessary or appropriate to expeditiously obtain a Sale Hearing and entry of the Sale Order.

**Section 8.02        Conditions to Obligations of Buyer.**  In addition to the conditions set forth in **Section 8.01**, the obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver (which shall be in writing), at or prior to the Closing, of each of the following conditions:

(a)    The Bankruptcy Court shall have entered the Bidding Procedures Order no later than twenty-five (25) days after the Petition Date, which order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Bidding Procedures Order shall be in effect at any time thereafter, and no appeal, motion for reconsideration, motion for stay pending appeal, or any other request for review of or relief from the Sale Order shall be pending.

(b)    The Bankruptcy Court shall have entered the Sale Order no later than sixty (60) days after the Petition Date, which order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(c)    The representations and warranties of Seller set forth in this Agreement were true and correct in all material respects when made and as of the Closing Date.

(d)    Seller shall have performed and complied in all material respects with all agreements, covenants and conditions set forth in this Agreement.

(e)    No Governmental Order shall have been enacted, issued, promulgated, enforced or entered which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

(f)    Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents and such other documents and deliveries set forth in **Section 3.02(a)**.

(g)    All approvals, consents and waivers of third parties (including those from Governmental Authorities) for Consent Pending Contracts that are listed on **Section 2.05(b)** of the Disclosure Schedules shall have been received, executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing, and no such approval, consent and waiver shall have been revoked, except to the extent the Bankruptcy Court permits or authorizes any Consent Pending Contract to be Transferred to Buyer without such consent.

(h)    From the date of this Agreement, there shall not have occurred any Material Adverse Effect caused by any Extraordinary Event, nor shall any Extraordinary Event or Events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(i)    Seller shall have delivered to Buyer such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 8.03      Conditions to Obligations of Seller.**  In addition to the conditions set forth in **Section 8.01**, the obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver (which shall be in writing), at or prior to the Closing, of each of the following conditions:

(a)      The Bankruptcy Court shall have entered the Bidding Procedures Order no later than twenty-five (25) days after the Petition Date, which order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Bidding Procedures Order shall be in effect at any time thereafter.

(b)      The Bankruptcy Court shall have entered the Sale Order no later than sixty (60) days after the Petition Date, which order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(c)      The representations and warranties of Buyer set forth in this Agreement were true and correct in all material respects when made and as of the Closing Date.

(d)      Buyer shall have performed and complied in all material respects with all agreements, covenants and conditions set forth in this Agreement.

(e)      No Governmental Order shall have been enacted, issued, promulgated, enforced or entered which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

(f)      Buyer shall have delivered to Seller, duly executed counterparts to the Transaction Documents and such other documents and deliveries set forth in **Section 3.02(b)**.

(g)      Buyer shall have paid all Cash Consideration pursuant to **Section 2.06** (including delivery of the Deposit to the Deposit Agent pursuant to **Section 2.06(a)**).

(h)      Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

# ARTICLE IX
# TERMINATION AND OTHER REMEDIES

**Section 9.01      Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Buyer.

(b)      by either Seller or Buyer by written notice to the other if:

(i)      the Bidding Procedures Order (or any portion thereof) is not granted by the Bankruptcy Court within twenty-five (25) days after the Petition Date, for any reason;

(ii)      the Sale Order is not entered by the Bankruptcy Court within sixty (60) days after the Petition Date; *provided, however,* that the right to terminate this Agreement under this **Section 9.01(b)(ii)** shall not be available to either Party whose failure (or in the case of a Seller as the terminating Party, any Seller's failure) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Sale Order to have been entered on or prior to such date;

(iii)      the Closing shall not have occurred within thirty (30) days following the Sale Hearing; *provided, however,* that the right to terminate this Agreement under this **Section 9.01(b)(iii)** shall not be available to either Party whose failure (or in the case of Seller as the terminating Party, Seller's failure) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to have occurred on or prior to such date; or

29

(iv)    a Governmental Order has been enacted, issued, promulgated, enforced or entered which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement, including for the avoidance of doubt, entry of a Sale Order approving an Alternative Transaction.

(c)    by Buyer by written notice to Seller if:

(i)    there has occurred, or will occur, any Material Adverse Effect caused by any Extraordinary Event, including as a result of the failure to effect a Transfer of an Assigned Contract or Non-Assured Contract;

(ii)    there has been a material breach by Seller of any of Seller's agreements, covenants, representations or warranties set forth herein or in the Sale Order or the Bidding Procedures Order and Seller has failed to cure such breach within ten (10) Business Days after receipt of a Buyer Termination Notice; *provided, however*, that Buyer (x) is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Sale Order or Bidding Procedures Order, (y) notifies Seller in writing (the "**Buyer Termination Notice**") of its intention to exercise its rights under this Agreement as a result of the breach, and (z) specifies in such Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Sale Order or Bidding Procedures Order of which Seller is allegedly in material breach;

(iii)    the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such trustee rejects the transactions contemplated by this Agreement;

(iv)    any of the closing conditions set forth in **Section 8.01** and **Section 8.02** has not been satisfied, or if it becomes apparent that any such conditions will be impossible to satisfy, by June 30, 2014 (or such earlier date on which the condition is required to be satisfied) unless such failure is due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied in any material respect with by Buyer prior to the Closing; or

(d)    by Seller by written notice to Buyer if:

(i)    there has been a material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties set forth herein or in the Bidding Procedures Order or the Sale Order, and the failure of the Buyer to cure such breach within ten (10) days after receipt of the Seller Termination Notice specified in this subsection; *provided, however*, that Seller (x) is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order or the Sale Order, (y) notifies Buyer in writing (the "**Seller Termination Notice**") of its intention to exercise its rights under this Agreement as a result of the breach, and (z) specifies in such Seller's Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bidding Procedures Order or the Sale Order of which Buyer is allegedly in material breach; or

(ii)    any of the closing conditions set forth in **Section 8.01** and **Section 8.03** has not been satisfied, or if it becomes apparent that any such conditions will be impossible to satisfy, by June 30, 2014 (or such earlier date on which the condition is required to be satisfied) unless such failure is due to the failure of Seller to perform or comply in any material respect with any of the covenants, agreements or conditions hereof to be performed or complied with by Seller prior to the Closing.

**Section 9.02    Effect of Termination.**    In the event of termination of this Agreement by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of either Party to any other Party. The provisions of this Agreement shall forthwith become void except:

(a)    as set forth in this **Article IX** and **Article X**;

(b)    that nothing herein shall relieve either Party from liability for any willful breach of any provision hereof; and

(c)    in the event of a termination pursuant to this **Article IX** (other than pursuant to **Section 9.01(d)(i)**), Seller shall cause the Deposit Agent to promptly return the Deposit to Buyer.

# ARTICLE X
# MISCELLANEOUS

**Section 10.01    Confidential Nature of Obligations.** The following paragraph is subject to any disclosure requirements under the Bankruptcy Code or imposed by the Bankruptcy Court or as Seller may reasonably deem necessary or appropriate in order to facilitate the transactions contemplated herein.

Buyer and Seller each agree that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other Party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, at the request of the disclosing Party, will return to the other Party all copies of nonpublic documents and materials which have been furnished in connection therewith. Such non-public documents, materials and information shall not be communicated to any third Person (other than to Buyer's and Seller's counsel, accountants or financial advisors, in each case subject to the recipient's agreement to keep the same confidential). No other Party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Purchased Assets; *provided, however*, that after the Closing, any confidential information included in the Purchased Assets or the Assumed Liabilities shall be deemed the confidential information of Buyer, and Seller shall maintain the confidentiality thereof in accordance with this **Section 10.01**. The obligation of each Party to treat such documents, materials and other information in confidence shall not apply to any information which (i) is or becomes available to such Party from a source other than the disclosing Party, (ii) is or becomes available to the public other than as a result of disclosure by such Party or its agents or (iii) is required to be disclosed under applicable law or judicial process (including under the Bankruptcy Code or as required by the Bankruptcy Court), but only to the extent it must be disclosed. Notwithstanding clause (iii) of the preceding sentence, in the event that either Party is required to disclose any confidential information by applicable law, judicial process or rule of any national securities exchange, it is agreed that the Party subject to such requirement will provide the other Party with prompt notice of such requirement and such Party may seek an appropriate protective order if it so desires.

**Section 10.02    Survival.** The representations and warranties of Seller and Buyer contained in this Agreement shall survive the Closing Date for three (3) months after the Closing Date. Unless otherwise stated in this Agreement, all covenants and undertakings of Seller and Buyer contained herein shall survive the Closing for three (3) months after the Closing Date.

**Section 10.03    Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, any fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, subject to Bankruptcy Court approval where required, whether or not the Closing shall have occurred.

**Section 10.04    Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this **Section 10.04**):

| If to Seller: | Hedwin Corporation |
| | c/o Charles Deutchman |
| | Chief Restructuring Officer |
| | Shared Management Resources, Ltd. |
| | 28026 Gates Mills Blvd |
| | Pepper Pike, OH 44124-4730 |

E-mail: cdeutchman@shrmgtres.com
Attention: Chief Restructuring Officer

with a copy to:
Tydings & Rosenberg LLP
100 East Pratt Street
Baltimore, MD 21202

Facsimile: 410-727-5460
E-mail: sgoldberg@tydingslaw.com; agrochal@tydingslaw.com
Attention: Stephen M. Goldberg; Alan M. Grochal

If to Buyer:
Fujimori Kogyo Co., Ltd.
1-23-7 Nishi–Shinjuku
Shinjuku-ku, Tokyo 160-0023
Japan

Facsimile: +81-3-5909-5779
E-mail: hiroshi-saga@zacros.co.jp
Attention: Corporate Planning Department

with a copy to:
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 11238

Facsimile: 212-858-1500
E-mail: takeo.akiyama@pillsburylaw.com
Attention: Takeo Akiyama, Esq.

**Section 10.05      Interpretation**  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  All words used in this Agreement shall be construed to be of such gender or number as the circumstances require.  Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.  The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

**Section 10.06      Headings.**  The headings of Sections in this Agreement are provided for convenience only and shall not affect its construction or interpretation.  All references to "Article," "Section" or "Sections" refer to the corresponding Article, Section or Sections of this Agreement.

**Section 10.07**    **Severability.**  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.08**    **Entire Agreement.**  This Agreement (including the Disclosure Schedules and the Exhibits hereto) and the other Transaction Documents constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.09**    **Assignment.**  This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by either Party hereto by operation of law or otherwise without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of such other Party); *provided, however*, that Buyer shall be permitted, upon prior notice to Seller, to assign all or part of its rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of its obligations under this Agreement.

**Section 10.10**    **No Third Party Beneficiaries.**  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

**Section 10.11**    **Amendment and Modification; Waiver.**  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto.  No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by either Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.12**    **Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Maryland without giving effect to any choice or conflict of law provision or rule (whether of the State of Maryland or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Maryland.

(b)    THE PARTIES SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND FOR ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS

AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**Section 10.13** **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.14** **Time of Essence.** Time is of the essence in this Agreement.

**Section 10.15** **Disclosure Schedules.** The Disclosure Schedules of Seller are qualified in their entirety by reference to the specific provisions of this Agreement and are not intended to constitute, and shall not be construed as constituting, representations or warranties of Seller, except as and to the extent provided in this Agreement. In no event shall any disclosure of such additional matters be deemed or interpreted to broaden or otherwise amend any of the covenants or representations or warranties in this Agreement.

**Section 10.16** **No Recourse.** No past, present or future director, officer, manager, employee, incorporator, member, partner, stockholder, agent, attorney or representative of the respective Parties to this Agreement, in such capacity (any such Person in such capacity, a "**Non-Recourse Party**"), shall have any liability or obligation with respect to this Agreement or the transactions contemplated hereby, or with respect to any claim or cause of action that may arise out of this Agreement or the transactions contemplated hereby, or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby; in each case except for any claim or cause of action against a Non-Recourse Party (i) arising out of or in connection with the fraud, bad faith or willful misconduct of such Non-Recourse Party, including in connection with this Agreement or any other Transaction Document, or (ii) otherwise expressly permitted to be brought against a Non-Recourse Party pursuant to any other Transaction Document, as applicable. For the avoidance of doubt, nothing in this Section is intended to or shall be deemed to in any way limit or affect any rights of Seller with respect to any Avoidance Claims or Actions relating thereto, or any other claims against any person arising out of actions or conduct of such person arising prior to or outside the context of this Agreement.

**Signatures on Next Page.**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

**HEDWIN CORPORATION**

By: *Richard F. Broo*
Name: *Richard F. Broo*
Title: *President/CEO*

**BUYER:**

**FUJIMORI KOGYO CO., LTD.**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

**HEDWIN CORPORATION**

By: _____

Name:

Title:

**BUYER:**

**FUJIMORI KOGYO CO., LTD.**

By: _Eishi Fuyama_

Name: Eishi Fuyama

Title: President

**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

In re:                                              *

**HEDWIN CORPORATION**              *    **Case No.** _____

         **Debtor**                             *    **Chapter 11**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**ORDER (A) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTOR'S
ASSETS; (B) AUTHORIZING AND SCHEDULING AN AUCTION; (C) SCHEDULING
HEARING FOR APPROVAL OF THE SALE OF ASSETS FREE AND CLEAR OF
LIENS AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES TO THE SUCCESSFUL BIDDER; (D)
APPROVING BREAKUP FEE AND EXPENSE REIMBURSEMENT; (E) APPROVING
PROCEDURES AND SETTING DEADLINES FOR THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
INCLUDING CURE AMOUNTS
RELATING THERETO; (F) APPROVING CERTAIN DEADLINES
AND THE FORM, MANNER AND SUFFICIENCY OF NOTICE;
AND (G) GRANTING OTHER RELATED RELIEF**

Upon the motion (the "Bid Procedures Motion") of Hedwin Corporation, debtor and

debtor in possession (the "Debtor") for entry of an Order (a) approving bidding procedures for

the sale of substantially all of the Debtor's assets; (b) setting a date for and authorizing an

auction (the "Auction") to sell the Debtor's assets; (c) scheduling a hearing (the "Sale

Hearing") for approval of a sale of the Debtor's assets free and clear of liens, claims,

encumbrances and other interests, and of the assumption and assignment of certain executory

contracts and unexpired leases; (d) authorizing payment of a breakup fee and expense reimbursement; (e) approving procedures and setting deadlines for the assumption and assignment of executory contracts and unexpired leases, including cure claims relating thereto; and (f) approving certain deadlines and the form, manner and sufficiency notice of the foregoing; and (g) granting other related relief,[1] and it appearing that the Court has jurisdiction over the Bid Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(a); the Court having considered the Bid Procedures Motion; and it appearing that the relief requested in the Bid Procedures Motion is in the best interests of the Debtor's bankruptcy estate, its creditors and other parties-in-interest; and after due deliberation and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.    Notice of the Bid Procedures Motion was adequate and sufficient under the circumstances of this chapter 11 case, and such notice complied with all applicable requirements of title 11 of the United States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules.

B.    All objections to the relief requested in the Bid Procedures Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Bid Procedures Motion or by stipulation filed with the Court, are overruled except as otherwise expressly set forth herein.

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Procedures Motion. The term "Assets" shall have the same meaning as "Purchased Assets" as set forth in the Stalking Horse APA. The purchaser under the Stalking Horse APA will be Fujimori Kogyo Co., Ltd. or its designee, a direct or indirect wholly-owned subsidiary.

C.      The bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures") are reasonable and appropriate under the circumstances of this Chapter 11 case.

D.      The Notice of Bidding Procedures, Auction Date and Sale Hearing, substantially in the form attached hereto as **Exhibit 2** (the "Sale and Bidding Procedures Notice"), the Notice of Auction and Sale Hearing, substantially in the form attached hereto as **Exhibit 3** (the "Creditor Notice"), and the notice substantially in the form attached hereto as **Exhibit 4** to be served on counterparties to the Assumed Contracts (the "Cure Notice"), are each calculated to provide adequate notice concerning the proposed sale of the Assets and the proposed assumption and assignment of the Assumed Contracts, as contemplated in the Stalking Horse APA, and are intended to provide due and adequate notice of the relief sought in the Sale Motion.

E.      Fujimori Kogyo Co., Ltd.  ("Buyer") has expended considerable time and expense in connection with the Stalking Horse APA and the negotiation thereof and the identification and quantification of assets of the Debtor, justifying the Break-Up Fee and Expense Reimbursement (each defined below) and the terms relating thereto approved by the Court below.

F.      The entry of this Order is in the best interests of the Debtor, the bankruptcy estate, its creditors and other parties in interest.

IT IS HEREBY ORDERED THAT:

1.      The relief requested in the Bid Procedures Motion is granted as set forth in this Order.

2.    The Bidding Procedures are approved in their entirety, and are incorporated into this Order as though fully set forth herein and shall apply to the proposed Auction and sale of the Assets.

3.    The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.    The proposed sale of the Assets, the proposed assumption and assignment of the Assumed Contracts, and the Auction shall be conducted in accordance with the provisions of this Order and the Bidding Procedures.

5.    The Sale and Bidding Procedures Notice attached hereto as **Exhibit 2**, the Creditor Notice attached hereto as **Exhibit 3**, and the Cure Notice attached hereto as **Exhibit 4** provide proper notice to all parties in interest and are approved.

6.    Within three (3) business days following entry of this Order, the Debtor shall serve by first class mail the Sale and Bidding Procedures Notice on the following parties:  (a) the U.S. Trustee; (b) counsel to the Committee (or if none, to the members of the Committee), and the 20 largest unsecured creditors; (c) the Trustees of the ESOP; (d) the Trustees of the Pension Plan; (e) counsel to the Bank of America; (f) counsel to ACP-I, L.P.; (g) all parties known to be asserting a lien (which includes Bank of America, N.A. and ACP-I, L.P.) on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on the Debtor's assets; (h) all known counterparties to the Assumed Contracts (including Toyota Motor Corporation); (i) all entities known to have expressed an interest in bidding on the Assets; (j) the United States Attorney's Office for the District of Maryland; (k)

the Securities and Exchange Commission; (l) the Pension Guaranty Corporation; (m) the state taxing authorities in Maryland and Nevada and the Internal Revenue Service; (n) the state attorney generals in Maryland and Nevada; (o) the U.S. Environmental Protection Agency; (p) the Maryland Department of the Environment; (q) the U.S. Department of Labor-OSHA; (r) the Maryland Occupational Safety and Health (MOSH); and (s) all other parties that filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of this Order.

7.     Within three (3) business days following entry of this Order, the Debtor shall serve the Creditor Notice on all known creditors of the Debtor.  Except as set forth in paragraph 6 and 7 of this Order, no other or further notice of the sale shall be required to be provided by the Debtors.

8.     Within three (3) business days following entry of this Order, the Debtor shall file and serve the Cure Notice on the counterparties to the Assumed Contracts as contemplated by the Stalking Horse APA; provided, however that the Debtor may add executory contracts to the schedule of Assumed Contracts up to ten (10) calendar days prior to the Sale Hearing and mail and serve a Cure Notice on the relevant additional counterparties.  Counterparties to the Assumed Contracts[2] (each a "Counterparty," and together, the "Counterparties") must file and serve any objection to the assumption and assignment of any Assumed Contract, including objections to any Cure Cost and such objections must attach a complete copy of the Assumed

---

[2]     The inclusion of any agreement as an Assumed Contract does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included as an Assumed Contract.