IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

In re:                                        *

HEDWIN CORPORATION              *   Case No. 14-15194

    Debtor                               *   Chapter 11

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEBTOR'S MOTION FOR AN ORDER (A) APPROVING ASSET PURCHASE
AGREEMENT AND AUTHORIZING THE SALE OF ASSETS OUTSIDE THE
ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS
PURSUANT TO SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE; (C)
AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

Hedwin Corporation, the debtor and debtor in possession ("Hedwin" or the
"Debtor"), by counsel, moves, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and
Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, for the entry of an Order,
the proposed form of which is attached as **Exhibit 1** (the "Sale Order"): (a) approving an asset
purchase agreement and authorizing the sale of assets outside the ordinary course of business; (b)
authorizing the sale of assets free and clear of all liens, claims, encumbrances and interests pursuant
to sections 363(b), (f) and (m) of the Bankruptcy Code; (c) authorizing the assumption and
assignment of certain executory contracts and unexpired leases; and (d) granting related relief (this
motion is referred to herein as the "Sale Motion," and the hearing on this motion is referred to herein
as the "Sale Hearing").

In support of this Sale Motion, the Debtor states as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and
1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory or other predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 and 6006-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland.

## The Bankruptcy Case

4. On April 2, 2014 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

5. The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. As of the date of this Sale Motion, no official committee of unsecured creditors (the "Committee") has been appointed by the Office of the United States Trustee for the District of Maryland (the "U.S. Trustee") pursuant to section 1102(a)(1) of the Bankruptcy Code.

7. Concurrently with the filing of this Sale Motion, the Debtor filed Debtor's Motion for an Order (A) Approving Bidding Procedures For Sale Of Debtor's Assets; (B) Authorizing And Scheduling An Auction; (C) Scheduling Hearing For Approval Of The Sale Of Assets Free And Clear Of Liens And The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases To The Successful Bidder; (D) Approving Breakup Fee And Expense Reimbursement; (E) Approving Procedures And Setting Deadlines For The Assumption And Assignment Of Executory Contracts And Unexpired Leases, Including Cure Amounts Relating Thereto; (F) Approving Certain Deadlines And The Form, Manner And Sufficiency Of Notice and, (G) Granting Other Related Relief (the "Bidding Procedures Motion"), which seeks approval of certain sale and bidding procedures for the sale, as more particularly set forth therein (the "Bidding Procedures"). The sale, approval of which is sought by this Sale Motion (the "Sale"), shall be either

2

to (i) Fujimori Kogyo Co., Ltd. ("Fujimori" or the "Stalking Horse Bidder")[1] pursuant to that certain Asset Purchase Agreement dated April 1, 2014 between Fujimori and the Debtor (the "Stalking Horse APA") or (ii) the highest and best bidder at the auction (the "Auction"), if any, conducted by the Debtor pursuant to the terms of Bidding Procedures and the order approving the Bidding Procedures and Bidding Procedures Motion (the "Bidding Procedures Order"). The successful bidder (i.e,, the party to whom the Debtor, at the Sale Hearing, will seek Court approval to sell substantially of its assets), whether Fujimori (in the event of no Auction), or the highest and best bidder at the Auction (which may also be Fujimori), is referred to herein as "Successful Bidder."

8. In addition, on the Petition Date, the Debtor filed a Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to Obtain Postpetition Financing, (B) Granting Liens and Superpriority Claims, (C) Authorizing Use of Cash Collateral, (D) Granting Adequate Protection to Prepetition Secured Parties, and (E) Scheduling a Final Hearing (the "DIP Motion"), seeking authorization to, among other things, obtain secured postpetition financing from Bank of America, N.A. ("Bank of America") and use of the cash collateral of Bank of America and ACP-I, L.P. ("ACP"). Bank of America, which holds a first priority lien on all of the Debtor's assets, and ACP, which holds a second priority lien on all of the Debtor's assets, are sometimes collectively referred to as the "Secured Parties."

**Company Background**

9. The Debtor is a Maryland corporation and since 2004 has been wholly owned by current and former employees of the company pursuant to an Employee Stock Option Plan (the "ESOP").

---

[1]    As used herein, the term "Purchaser" includes Fujimori and its designee to purchase the Assets, a direct or indirect wholly-owned subsidiary of Fujimori.

10.     The company was founded in 1946 as a manufacturer of molten sheet thermoforms for use in plastic heat-sealing. In 1956, Hedwin patented its Cuitainer® design.  In subsequent years, the company's product lines grew to include blow molding and injection molding technologies.

11.     The Debtor is a leading manufacturer of customized industrial plastic packaging, which it sells to wholesalers and distributors throughout the United States, Canada and Europe.  The company's products include high performance and regulated specialty industrial packaging for use in the chemical, medical and institutional food industries.  The principal product lines consist of: (i) the Cubitainer® Package with accompanying Cube® Insert, which is a high performance alternative to open pail heads; (ii) blow-molded high density polyethylene containers, which include branded and custom extruded and lightweight containers, bottles and pails; and (iii) branded liners designed to protect materials processed in pails and drums.

12.     As of the Petition Date, the Debtor employed approximately 300 employees, of which approximately 50 are salaried and approximately 250 are hourly.  None of the Debtor's employees are represented by a labor union.

13.     The Debtor's manufacturing facility is located at 1600 Roland Heights Avenue, Baltimore, Maryland.  The Debtor has a warehouse facility at 1700 West 41st Street, Baltimore, Maryland and a warehouse and assembly facility at 9175 Moya Blvd. (Unit D), Reno, Nevada.  All of the Debtor's facilities are leased.

14.     In 2012, the Debtor recorded net sales of $44 million with $4.5 million in gross profit.  In 2013, the Debtor generated net sales of $43.5 million and had gross profits of $3.4 million.  The decline in revenue in 2013 was primarily attributable to the business interruption resulting from a major fire in June 2013 to the Debtor's manufacturing facility.  The fire negatively affected the Debtor's operations, causing a shutdown in certain assembly lines.

4

15.    As of the fiscal year end December 31, 2013, the Debtor had total net assets of approximately $15 million.

16.    A combination of factors and events has negatively impacted and continue to adversely affect the Debtor's business operations and its financial condition.  The Debtor's current weakened and worsening financial condition stems from, among other things: (i) expenses incurred and losses sustained due to the June 2013 fire to the Debtor's manufacturing facility; (ii) fluctuating and higher resin prices; (iii) margin compression; and (iv) delayed capital investment in equipment and production processes, resulting in increased production costs and inefficiencies.

17.    In October, 2013, the Debtor hired Shared Management Resources, Ltd. ("SMR"), by and through its managing director Charles S. Deutchman, as Chief Restructuring Officer (the "CRO").  The CRO has conducted extensive due diligence into the Debtor's financial condition, has explored various strategies with management for improving the company's performance, and has assisted and continues to assist management in restructuring the current operations of its business.

18.    In December 2013, the Debtor retained Mesirow Financial, Inc. ("Mesirow") as its investment banker to assist the Debtor in identifying strategic alternatives and to assist the Debtor in connection with any possible sale transaction.

19.    The Debtor, in consultation with its advisors and the Secured Parties, determined the filing of a Chapter 11 bankruptcy case was necessary and appropriate and that a sale of substantially all of the Debtor's assets was the best option presently available to maximize value and preserve employee jobs.  The Debtor has minimal liquidity and the Secured Parties are unwilling to extend additional credit to the Debtor except to the limited extent set forth in the DIP Motion. Absent a sale, the Debtor would have to immediately terminate its employees and begin the wholesale liquidation of its assets to the detriment of the estate and its creditors.

## The Initial Sale Process

20.     For several months preceding the Petition Date, the Debtor, together with its CRO and Mesirow, worked cooperatively to analyze and evaluate the business, operations and financial condition of the Debtor.  As part of this process, Mesirow assisted in: (i) preparing and negotiating confidentiality agreements for prospective purchasers; (ii) preparing an offering memorandum containing detailed information about the Debtor's business, operations and financial condition; (iii) identifying and contacting potential purchasers of the Debtor's assets; (iv) establishing a data room for due diligence to be conducted by prospective purchasers; (v) evaluating proposals from prospective purchasers; and (vi) negotiating a stalking horse offer.

21.     As part of its marketing efforts, Mesirow contacted 78 parties to elicit interest in acquiring all or portion of Hedwin's business.  Interested parties were given operational, organizational and financial information on the Debtor and all were offered the opportunity to conduct on site due diligence.  Only 10 parties conducted on site due diligence and used the virtual data room set up by the Debtor.

22.     Mesirow, after consultation with the Debtor, set a deadline of March 12, 2014, for the submission of offers and gave notice of the deadline to each party that had expressed an interest in making an offer.  The Debtor prepared a proposed form of asset purchase agreement for the contemplated sale, which was made available to prospective bidders in the virtual data room established by Debtor for such prospective bidders to conduct due diligence.

## The Stalking Horse Offer

23.     The Debtor has received offers to purchase substantially all of the assets of the Debtor from: (i) Fujimori; (ii) Peak Rock Capital; (iii) Blackstreet Capital Management, LLC; and (iv) Platinum Equity Advisors, LLC.

6

24.     After consultation with its advisors, the Debtor determined that the offer of Fujimori is presently the highest and best offer submitted (the "Stalking Horse Offer").  Accordingly, the Debtor and Fujimori (as the Stalking Horse Bidder) entered into the Stalking Horse APA, attached to the Bidding Procedures Motion as Exhibit 2, subject to higher and better offers and conditioned upon approval of the Bankruptcy Court.

25.     The terms of sale agreed to by the Debtor and the Stalking Horse Bidder are set forth with particularity in the Stalking Horse APA.  Under the Stalking Horse APA, other than specifically "Excluded Assets," the Debtor would sell (and the Stalking Horse Bidder will buy) all of the Debtor's right, title and interest in, to and under all assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), whether presently existing or hereafter acquired, owned, leased, licensed or used or held for use in or relating to the operation of the Debtor's business (the "Assets"). [2]  The Assets include, among other things, all of the Debtor's accounts receivable, certain contracts, equipment, intellectual property, inventory, leases, and other tangible personal property.

26.     Under the Stalking Horse APA, certain "Excluded Assets" are not being sold to the Stalking Horse Bidder.  The "Excluded Assets" include, without limitation, all of Debtor's cash and cash equivalents, all avoidance claims arising under Chapter 5 of the Bankruptcy Code (with the exception of certain claims, such as those against creditors whose debts are being assumed), all of Debtor's bank accounts, certain insurance claims and rights to proceeds therefrom, all of Debtor's corporate and organizational documents; and all contracts not assumed.

27.     The purchase price for the Assets under the Stalking Horse APA is $16,500,000.00 plus the assumption of certain liabilities.

---

[2]     As used herein, the term Assets has the same meaning as "Purchased Assets" in the Stalking Horse APA.  In the event of a conflict between the summary descriptions of the Stalking Horse APA contained herein and the Stalking Horse APA, the latter shall control.

7

28. The Stalking Horse APA also provides, among other things, as follows:

(a) The Assets will be sold free and clear of liens, claims, encumbrances and other interests.

(b) The Court shall approve payment to the Stalking Horse Bidder (as a general, not super-priority, administrative claim) of a break-up fee in an amount equal to $600,000 (the "Break-Up Fee") and an expense reimbursement in an amount not to exceed $250,000 (the "Expense Reimbursement") for the Stalking Horse Bidder's reasonable and documented out-of-pocket expenses incurred in connection with the transaction contemplated hereby. The Break-Up Fee and the Expense Reimbursement shall be paid to the Stalking Horse Bidder from the proceeds (the "Alternative Transaction Proceeds") of sale on the closing of an Alternative Transaction (defined in the Stalking Horse APA) approved by the Bankruptcy Court. Such payments shall be made to the Stalking Horse Bidder (i) on the closing date of the Alternative Transaction and (ii) prior to any other distributions to creditors (or otherwise) from the Alternative Transaction Proceeds.

(c) The Stalking Horse Bidder will assume certain liabilities (the "Assumed Liabilities"), including the payment of all trade account payables that remain unpaid as of closing. The trade account payables that will be assumed by the Stalking Horse Bidder include the cure costs for executory contracts and unexpired leases to be assumed by the Debtor and assigned to the Stalking Horse Bidder.

(d) Certain executory contracts and unexpired leases will be assumed by the Debtor and assigned to the Stalking Horse Bidder, with the payment of all cure costs being advanced by the Stalking Horse Bidder in accordance with the terms of the Stalking Horse APA.

#2166235v.2

(e)  Except as expressly stated in the Stalking Horse APA, the Debtor is making no representation or warranties whatsoever, express or implied, with respect to any matter relating to the Assets.  The Assets are being sold "AS IS," "WHERE IS," and "WITH ALL FAULTS."

(f)  The Staking Horse APA provides for the retention of all employees of the Debtor actively at work on the closing date.

29.  The Stalking Horse Offer is the basis for soliciting opening bids for a possible auction of the Assets.  Pursuant to the Bidding Procedures Order and the Bidding Procedures, if the Debtor receives one or more "Qualified Bids" (as defined in the Bidding Procedures)  an Auction will be commenced on a date set by the Court at Tydings & Rosenberg, LLP, 100 East Pratt Street, 26th Floor, Baltimore Maryland 21202 (the "Auction).  All bids for and at the Auction must comply with the Bidding Procedures approved by this Court.  In the event of an Auction, the Debtor intends to enter into a definitive asset purchase agreement (the "APA")[3] with the Successful Bidder.

30.  The Debtor believes that the sale of the Assets as a going concern to the highest or best bidder determined in accordance with the Bidding Procedures is far preferable to a piecemeal liquidation of the Assets.

## Relief Requested

31.  The Debtor is requesting that this Court: (i) authorize the sale of the Assets to the Successful Bidder pursuant to such agreement(s) entered into in accordance with the Bidding Procedures Order, free and clear of all liens, claims, encumbrances or other interests pursuant to sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, with such liens, claims, rights, interests and encumbrances (collectively, the "Interests") to attach to the sale proceeds of the Assets with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale and with the closing to occur on or before June 30, 2014, unless such date is extended in writing by

---

[3]  The Stalking Horse APA may be the "APA."

9

the Debtor, the Purchaser and Bank of America (ii) approve the assumption and assignment of the

Assumed Contracts  (defined ) under section 365 of the Bankruptcy Code, subject to, and at the time

of, closing under the APA; and (iii) grant such other relief as may be necessary or appropriate.

## Basis for Relief

### A.  Sale Negotiated In Good Faith And To Be Made For Sound Business Reasons; and the Purchase Price is Fair and Reasonable

32.    The Bankruptcy Code permits a debtor to sell some or substantially all of its

assets outside the ordinary course of business and prior to confirmation of a Chapter 11 plan. Section

363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell,

or lease, other than in the ordinary course of business, property of the estate."  This Court has held

that transactions should be approved under section 363(b) (1) of the Bankruptcy Code when they are

supported by a sound business reason. *See In re Naron & Wagner, Chartered*, 88 B.R. 85, 87 (Bankr.

D. Md. 1988).  *See also In re WBQ P'ship*, 189 B.R. 97 (Bankr. E.D. VA 1995) (citing *Stephens

Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Security Holders v.

Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  In reviewing such a proposed

transaction, courts give substantial deference to the business judgment of the debtor-in-possession.

*See e.g., Esposito v. Title Inc. Co. of Pa. (In re Fernwood Mkts)*, 73 B.R. 616, 621 n.2 (Bankr. E.D.

Pa. 1987).

33.    In this case, the sale of the Assets serves a sound business purpose.  The sale

is designed to preserve and enhance the value of the Assets as a whole, and to assure that the

Assumed Contracts are assigned while they have their highest value and prior to any risk of a

premature termination.  The sale of the Assets, when coupled with access to the Debtor's wholesale

and distributor network and sale channels, and the Debtor's recognized name and goodwill in the

customized industrial plastic packing industry, preserves the enterprise value of the Assets and is a

sound exercise of business judgment.  Such a sale will return a greater benefit to the Debtor's estate

10

than any of the alternatives, including a sale at a later date, the continuation of operations until confirmation of a plan, or the piecemeal liquidation of the Assets.

34.     A sale of the Assets is the best option presently available to maximize value and preserve employee jobs and is proposed by the Debtor in good faith.  Absent a sale, the Debtor would have to immediately terminate its employees and begin the wholesale liquidation of its assets to the detriment of its estate and creditors. The Debtor has proposed the sale of the Assets as the only viable approach currently available to this estate and has concluded that the sale is supported by a number of sound business reasons.

35.     Whether or not the Stalking Horse Bidder is ultimately the Successful Bidder, the Stalking Horse APA was the product of good faith, arm's-length negotiations, and is on commercially reasonable terms.  The Debtor and the Stalking Horse Bidder, with the assistance of their professional advisors, negotiated the terms of Stalking Horse APA.  The Stalking Horse Bidder provided substantial value to the estate in providing a baseline value for the Assets, and an opening bid for the Auction, and bidding at any Auction will be conducted in accordance with the Bidding Procedures and the Bidding Procedures Order.  If the Stalking Horse Bidder is not the Successful Bidder, the APA between the Debtor and the Successful Bidder will also be the product of good faith, arm's-length negotiations.

36.     As approved by the Court, the notice of the Sale, Sale Motion and Sale Hearing provides all creditors and parties-in-interest adequate and reasonable notice of the Sale, and provides sufficient information regarding the sale of substantially all of the Debtor's assets, terms and conditions of the Sale, the time for filing objections to the Sale, and meets the requirements of the Bankruptcy Code, the Bankruptcy Rules and due process.

37.     The fairness and reasonableness of the consideration ultimately to be paid by the Successful Bidder is demonstrated by the marketing efforts that the Debtor engaged in over the

11

past several months, followed by a fair, reasonable and competitive sale process under the Bidding

Procedures including a potential Auction, and culminating in a proposed sale of the Debtor's Assets.

Each of these efforts by the Debtor demonstrates that the purchase price obtained, after completion of

the process, is fair and reasonable.

**B.** **Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code For a Sale Free and Clear of Liens, Claims, and Interests**

38.    Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39.    Section 363(f) of the Bankruptcy Code provides for the sale of assets "free

and clear of any interests."  The term "any interest," as used in section 363(f), is not defined in the

Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F. 3d 252, 259 (3rd Cir.

2000).  In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest."

209 F. 3d at 258.  The Third Circuit observed that while some courts have "narrowly interpreted that

phrase to mean only *in rem* interests in Property," the trend in modern cases is towards "a broader

interpretation which includes other obligations that may flow from ownership of the Property."  *Id.* at

258 (citing 3 COLLIER ON BANKRUPTCY ¶ 363.06[1]).  As determined by the Fourth Circuit in *In re

Leckie Smokeless Coal Co.*, 99 F. 3d 573, 581-582 (4th Cir. 1996), section 363(f) is not limited to *in*

12

*rem* interests.  Thus, a debtor "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute."  *Leckie* 99 F. 3d at 581-582.

40.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to allow the sale of the Assets free and clear of all the Interests, except with respect to any Interests that constitute Assumed Liabilities under the APA.  The Debtor submits that each Interest that is not one of the Assumed Liabilities satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or attaching to the proceeds of the sale, subject to any claims and defenses the Debtor may possess with respect thereto.  The Debtor accordingly requests authority to convey the Assets to the Successful Bidder, free and clear of all Interests except the Assumed Liabilities under the express terms of the APA, with such Interests to attach to the proceeds of the Sale, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the APA and the proposed Sale Order.    The Debtor requests that any and all indebtedness, duties, obligations and liabilities arising before or after the Petition Date of the Debtor to Bank of America, arising under, pursuant to, in connection with and/or on account of the provisions of any prepetition financing documents, post-petition financing documents and interim and final Orders of this Court authorizing use of cash collateral and debtor-in-possession financing  (collectively, the "Bank of America Obligations") be paid in full to Bank of America from the proceeds of the sale of the Assets by wire transfer at Closing. The Debtor further requests that any and all indebtedness, duties, obligations and liabilities arising before or after the Petition Date of the Debtor to ACP, arising under, pursuant to, in connection with and/or on account of the provisions of any prepetition financing documents and  interim and final Orders of this Court authorizing use of cash collateral and debtor-in-possession financing (collectively, the

13

"ACP Obligations") be paid in full to ACP from the proceeds of the sale of the Assets by wire transfer at Closing.

41.     The Debtor will serve this Sale Motion on all purported lienholders against the Assets. Other than the Secured Parties identified in paragraph 5 above, the Debtor knows of no other liens against the Assets. The Debtor expects that as of the Sale Hearing, the Secured Parties will consent to the proposed sale.

42.     Accordingly, this Court should approve the sale of the Assets to the Successful Bidder free and clear of Interests under Bankruptcy Code section 363(f), and all potential claimants should be compelled to look exclusively to the proceeds of the Sale for satisfaction of their claims, provided however, that Bank of America and ACP-1should only be required to release any Interests in the Assets after receiving payment in full of all of the Bank of America Obligations and the ACP Obligations at Closing.

43.     Further, the Debtor submits that the Sale should not expose the Successful Bidder to any liability as a successor of the Debtor or its estate. *See Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F. 3d 252, 258 (3rd Cir. 2000); *Leckie Smokeless Coal Co*., 99 F. 3d at 582; *In re Remember Enters*., 425 B.R. 757, 765 (4th Cir. 2010) (there is no dispute that, in the 4th Circuit, a sale pursuant to Section 363(f) is free and clear of any claim of successor liability). The Successful Bidder will only be assuming those obligations expressly set forth in the APA.

C.  **Sale Closed in Good Faith Under Section 363(m) of the Bankruptcy Code; and Not in Violation of Section 363(n) of the Bankruptcy Code**

44.     Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

14

11 U.S.C. §363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in turn, that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders at the sale.  While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F. 2d 143 (3rd Cir. 1986) has held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F. 2d at 147 (citations omitted).

45.     As explained above, the APA between the Debtor and the Successful Bidder will be the product of good faith, arm's-length negotiations.  The Debtor intends to establish at the Sale Hearing that such APA was a negotiated, arm's-length transaction, in which the Successful Bidder has acted in good faith, without collusion or fraud of any kind, and in compliance with the *Abbotts Dairies* standard.  The evidence at the Sale Hearing will further establish that neither the Debtor nor the Successful Bidder has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or allow the Debtor to avoid the Sale pursuant to section 363(n) of the Bankruptcy Code with respect to the consummation of the sale transaction or the transfer of the Assets and the Assumed Contracts to the Successful Bidder.

46.     Accordingly, the Debtor requests that the Court find that the Successful Bidder has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) of the Bankruptcy Code.

**D.  Authorization of Assumption and Assignment of Assumed Contracts**

47.    In order to enhance the value to the Debtor's estate, the Debtor requests approval of the assumption and assignment of the executory contracts and unexpired leases, identified in the attached **Exhibit 2** (the "Assumed Contracts"),[4] to the Successful Bidder upon the closing of the transaction contemplated under the APA and payment of the cure costs (the "Cure Costs"), to be identified and set forth in separate cure notices to be mailed within three (3) business days following entry of the Bidding Procedures Order, which amounts, if any, are what the Debtor believes are owed to each counterparty (each a "Counterparty," and collectively, the "Counterparties") to an Assumed Contract in order to cure any defaults that exist under such contract or lease.  Notwithstanding the foregoing, the Successful Bidder may add to the list of Assumed Contracts (so long as the Debtor files and serves a Cure Notice on each affected Counterparty within ten (10) calendar days before the Sale Hearing), and may remove any executory contract or lease from the list of Assumed Contracts until seven (7) calendar days prior to the closing of the sale.

48.    In accordance with the terms of its APA, the Successful Bidder shall promptly pay or cause to be paid the Cure Costs with respect to the Assumed Contracts.  The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts.  The Debtor proposes that the Court make its determinations concerning the Cure Costs and adequate assurance of future performance under the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing or in the case of any Assumed Contracts not assumed and assigned to the Successful Bidder at the Sale Hearing, at such other properly noticed hearing to approve assumption and assignment of such Assumed Contract to the Successful Bidder.

---

[4]    The inclusion of any agreement as an Assumed Contract does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included as an Assumed Contract.

#2166235v.2

49.     Except to the extent otherwise provided in the APA entered into with the Successful Bidder, subject to the payment of any Cure Costs, the Successful Bidder will not be subject to any liability to the Assigned Contract Counterparty that accrued or arose before the Closing of the sale of the Assets and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

50.     The Debtor further requests that the Sale Order provide that the Assumed Contracts will be assigned to, and remain in full force and effect for the benefit of the Successful Bidder, notwithstanding any provisions in the Assumed Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

51.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under § 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

52.     Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *In re Talco, Inc.*, 558 F. 2d 1369, 1173 (10th Cir. 1977).  A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors.  *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986).  The assumption and assignment of the Assumed Contracts, or any of them, is a necessary part of the Sale and, therefore will benefit the estate of the Debtor.

53.     As set forth above, the Debtor will serve a copy of this Sale Motion to all Counterparties to the Assumed Contracts, notifying such Counterparties of the potential assumption by the Debtors and assignment to the Successful Bidder of the Assumed Contracts at the Sale Hearing.

54.     The Counterparties will have sufficient opportunity to file an objection to the proposed Cure Costs.  To the extent no objection is filed with regard to a particular cure amount, such cure amount shall be binding on the applicable contract or lease Counterparty.  The payment of the Cure Costs will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant to Section 365(b)(1) of the Bankruptcy Code, unless the Debtor determines that a particular contract is not truly executory, and does not need to be cured to transfer the Assets to the Successful Bidder.

55.     Cure Costs disputed by any Counterparties, with respect to any Assumed Contracts to be assumed and assigned to the Successful Bidder at Closing, will be resolved by the Court at the Sale Hearing or other hearing as determined by the Court.

56.    The Successful Bidder is responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of any Assumed Contracts.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989)*; see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Successful Bidder shall provide evidence of its ability to provide adequate assurances to Counterparties at the sale hearing.

### E.  Notice

57.    Concurrently with this filing, this Sale Motion will be served on: (a) the U.S. Trustee; (b) counsel to the Committee (or if none, to the members of the Committee), and the Debtor's twenty (20) largest creditors; (c) the Trustee of the ESOP; (d) the Trustees of the Pension Plan; (e) counsel to the Secured Parties (f) all parties known to be asserting a lien (which includes Bank of America, N.A. and ACP-I, L.P.) on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on the Debtor's assets; (g) all known Counterparties to the Assumed Contracts (including Toyota Motor Corporation); (h) all entities known to have expressed an interest in bidding on the Assets; (i) the United States Attorney's Office for the District of Maryland; (j) the Securities and Exchange Commission; (k) the Pension Guaranty Corporation; (l) the state taxing authorities in Maryland and Nevada and the Internal Revenue Service; (m) the state attorney generals in Maryland and Nevada; (n) the U.S. Environmental Protection Agency; (o) the Maryland Department of the Environment; (p) the U.S. Department of Labor-OSHA; (q) the Maryland Occupational Safety and Health (MOSH); and (r) all

other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bidding Procedures Order.

58.     In addition, within three (3) business days from the date of entry of the Bidding Procedures Order, the Debtor will serve that order and notice thereof on (a) the U.S. Trustee; (b) counsel to the Committee (or if none, to the members of the Committee), and the Debtor's twenty (20) largest creditors; (c) the Trustee of the ESOP; (d) the Trustees of the Pension Plan; (e) counsel to the Secured Parties (f) all parties known to be asserting a lien (which includes Bank of America, N.A. and ACP-I, L.P.) on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on the Debtor's assets; (g) all known Counterparties to the Assumed Contracts (including Toyota Motor Corporation); (h) all entities known to have expressed an interest in bidding on the Assets; (i) the United States Attorney's Office for the District of Maryland; (j) the Securities and Exchange Commission; (k) the Pension Guaranty Corporation; (l) the state taxing authorities in Maryland and Nevada and the Internal Revenue Service; (m) the state attorney generals in Maryland and Nevada; (n) the U.S. Environmental Protection Agency; (o) the Maryland Department of the Environment; (p) the U.S. Department of Labor-OSHA; (q) the Maryland Occupational Safety and Health (MOSH); and (r) all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bidding Procedures Order.  Notice of this Sale Motion and Sale Hearing will also be provided to all known creditors of the Debtor within three (3) business days from the date of entry of the Bidding Procedures Order.

59.     The Debtor submits that the notice that they have provided and intend to provide of this Sale Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice to grant the relief sought herein and to enter an order granting this Sale Motion in the form submitted herewith.  *See, e.g., In re Naron & Wagner,*

20

*Chartered*, 88 B.R. 85, 87 (Bankr. D. Md. 1988); *In re WBQ P'ship,* 189 B.R. 97, 103 (Bankr. E.D. VA 1995).

   60. The Debtor requests, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry (without any stay, automatic or otherwise).

   **WHEREFORE**, the Debtor requests that the Court grant this Sale Motion by entering either the proposed order submitted herewith (in the event of a sale to the Stalking Horse Bidder) or an order (substantially similar to the proposed order submitted herewith) approving the sale to an alternative Successful Bidder.  In doing so, the Debtor requests that the Court  (i) approve the APA of the Successful Bidder and authorize the sale of the Assets to the Successful Bidder pursuant to the terms of such APA; (ii) approve the assumption and assignment of the Assumed Contracts in accordance with the Successful Bidder's APA; (iii) authorize the distribution of such proceeds of the sale of the Assets to Bank of America and ACP-1 at Closing, in an amount sufficient to satisfy the Bank of America Obligations and the ACP Obligations (iv) approve the form and manner of notice of (a) the Sale Motion and sale Hearing ,(b) the proposed Sale and (c) the proposed assumption and assignment of Assumed Contracts; and (v) grant such other and further relief as is just and proper

Dated:  April 4, 2014

               */s/* Alan M. Grochal
               Alan M. Grochal, Bar No. 01447
               Stephen M. Goldberg, Bar No. 01156
               Catherine K. Hopkin, Bar No. 28257
               Tydings & Rosenberg LLP
               100 East Pratt Street, 26th Floor
               Baltimore, Maryland 21202
               Telephone:  410-752-9700
               Facsimile:  410-722-5460
               agrochal@tydingslaw.com
               sgoldberg@tydingslaw.com
               chopkin@tydingslaw.com
               Counsel for Debtor and Debtor in Possession